## EVATT v. MILLER.

### Opinion delivered June 29, 1914.

1. HUSBAND AND WIFE—SUBSEQUENT BIGAMOUS MARRIAGES—DOWER.— Where a man and woman are legally married, the woman continues to be the man's wife, although she subsequently contracts a bigamous marriage with another man, and upon the death of her lawful husband, the wife is entitled to her rights as his widow.

2. HUSBAND AND WIFE—BIGAMOUS MARRIAGE—RIGHTS OF WIFE.—Where a man is already lawfully married, and subsequently contracts a bigamous marriage with another woman, upon his death the latter has no rights in, and can not share in, his estate.

3. LEGITIMACY—CHILDREN OF VOID MARRIAGE.—Kirby's Digest, § 2640, which provides that the issue of all marriages deemed null in law,

or dissolved by divorce, shall be deemed and considered as legitimate, is limited to the issue of marriages, and does not include children born of persons whose relationship is merely that of persons who are illegally cohabiting together as man and wife.

4. MARRIAGE—MARRIAGE IN ANOTHER STATE—VALIDITY.—A marriage contracted in Texas, and valid under that law, will be treated as valid in this State. Kirby's Digest, § 5177.

5. MARRIAGES—CONFLICT OF LAWS—COMMON-LAW MARRIAGE.—A common-law marriage, contracted in Texas, and valid under that law, will be treated as valid in Arkansas.

6. DESCENT AND DISTRIBUTION—CHILDREN OF VOID MARRIAGE.—The children of a marriage, void, because the husband and father had a former wife living, are nevertheless legitimate and entitled to share in their father's estate, under Kirby's Digest, § 2640, which provides that the issue of a marriage null in law, shall be deemed legitimate.

Appeal from Scott Chancery Court; *W. A. Falconer,* Chancellor; reversed in part, and affirmed in part.

### STATEMENT BY THE COURT.

A man named Frank Mier, or Miller, died intestate in Scott County, Arkansas, on April 11, 1911. He had been a resident of that county for a number of years prior to his death, and, during all the time of his residence in that county, he lived with a woman named Lidmilla Miller, who was reputed to be his wife, and there was nothing in their relationship which aroused even a suspicion to the contrary. In addition to his reputed wife, he was survived by four children, one an adult daughter, who had married, and three minor children, and these children never suspected there was any question about their legitimacy until after the death of their father and the institution of the litigation involving his estate. Although Miller appears to have owned considerable land and personal property at the time of his death, his estate was largely involved, and after the qualification of appellant, J. M. Evatt, as administrator of his estate, various debts were probated. Among other demands filed for probate was a judgment in favor of M. C. Miller, a brother of the intestate, and this brother, M. C. Miller, also had a mortgagee's deed, which he received upon the foreclosure of a mortgage executed to

him by his brother, Frank. The administrator instituted a suit for the benefit of the heirs and creditors, in which it was alleged that this deed executed pursuant to the mortgage foreclosure, was fraudulent and had been executed for the purpose of cheating and defrauding various creditors in the collection of their just demands, and also for the purpose of placing the property beyond the reach of a probable judgment creditor, who at the time of the execution of the original mortgages, had a suit pending against the intestate for a considerable sum of money. That cause of action, however, appears to have been disposed of without the rendition of any judgment against the intestate.

A number of interventions were filed in this cause by various persons, who were made parties to that litigation. Among others, one Annie Miller filed an intervention in which she alleged that she and the intestate were married on the 16th of February, 1885, in Brazos County, Texas, and that about one year after their said marriage a son named Antone Frank Miller was born to them, and that shortly thereafter her husband deserted her and ran away with her sister, Lidmilla, with whom he had thereafter lived until a short time before his death, when he and the said Lidmilla separated and ceased to live together during the remainder of his life.

Antone Frank Miller was made a party, and alleged that he was the only heir at law of the intestate. Lidmilla and her adult daughter filed separate answers for themselves, and a guardian was appointed for the minor children of Lidmilla, who answered for them. In the answer of Lidmilla and her children the allegations contained in the petition of Anna were denied, and it was alleged that Lidmilla was the lawful wife, and her children the lawful heirs of the said intestate. They alleged also that the mortgages which were foreclosed and under which M. C. Miller claimed title, as well as the judgment in favor of the said M. C. Miller, were executed for the purpose of defrauding creditors, and of defeating them

in the assertion of their rights in the estate of the intestate.

The principals in this case were Bohemians, and resided originally in Brazos County, Texas. The evidence is to the effect that Frank Miller had courted the two sisters, Anna and Lidmilla, who was the younger; but that there was a Bohemian custom to the effect that a younger daughter should not marry while her elder sister was single, and Lidmilla testified that she became angry at the attempt of the members of her family to compel Frank to marry her sister and left home and moved to a point about one hundred miles distant, where she lived for something more than a year, when Frank came there and told her that he had married her sister but that he had been divorced from her, and she says that thereafter they went to his camp, where he was engaged in working timber, and they were married; and that soon thereafter they removed to Talihini, I. T., where they lived for a short time, after which they removed to Scott County, Arkansas, and lived together as man and wife until the time of their separation, about a year before the death of her husband. After Anna had been deserted by her husband she lived for some years with a man named Cooper, and, although she denies she was ever married to Cooper, the evidence discloses the contrary to be the truth. After living for some years with this man Cooper, by whom she had a child, she lived for some years with a man named Richardson, by whom she had other children, and it appears she also married this man Richardson, although she denied that that was a fact. There was no proof that either Anna Miller or her husband, Frank Miller, ever secured a divorce.

The chancellor found that Frank and Anna Miller were lawfully married in Texas and that Frank died intestate in Scott County, Arkansas, without ever having been divorced from Anna, and that Antone Frank Miller was his only child and lawful heir, and that all the property descended to the said child, subject to the payment of the intestate's debts and the dower and homestead

rights of the said Anna. The court decreed that the judgment in favor of M. C. Miller was a valid demand and that one of the mortgages had been assigned to the said M. C. Miller for a valuable consideration, and that the other mortgage was given to secure the payment of money which had been used in the purchase of the land described in the mortgage, and the court decreed that on that account the lands there described were not subject to the dower rights of the widow.

The administrator and Lidmilla and her children have duly appealed from that decree.

*A. G. Leming,* for J. M. Evatt, administrator.

1. "A deed made with intent to delay creditors in the collection of their just demands may be set aside on application of the executor or administrator of the fraudulent grantor 'for the use and benefit of the heirs at law.' " 74 Ark. 276. See also 67 Ark. 232; 72 Ark. 58; 64 Ark. 505; 68 Ark. 162; 74 Ark. 186; 76 Ark. 509; 73 Ark. 174; 64 Ark. 372.

2. "If a marriage in fact is established by evidence or admission, it is presumed to be regular and valid, and the burden of adducing evidence to the contrary rests on the party who attacks it." 26 Cyc. 877.

This presumption of regularity would apply equally to Anna in her marriage to Cooper and to Lidmilla in her marriage to Miller; and we think that the children of each by Miller are entitled to recognition as his heirs at law.

*Roberts & Kincannon,* for Lidmilla Miller *et al.*

1. One who attacks the validity of a marriage on the ground that one of the parties had previously been married to another person, does not fully discharge the burden of proof resting upon him by showing that there was a former valid marriage, but must go further and show affirmatively that the marriage had not been dissolved either by the death of the other party or by a decree of divorce. Tiffany's Persons & Domestic Relations, 41, 42, and cases cited, note 139.

The presumption of law being that a marriage is legal, the burden to show its illegality is upon the party who attacks it.   67 Ark. 278.

As to what constitutes marriage, see Bishop on Marriage & Divorce, § 437; 82 Ark. 81.

Where the validity of a marriage is questioned because of a former marriage of one of the parties, and it appears that at the time of the second marriage the former spouse was alive, it will be presumed that the former marriage was dissolved by divorce, and this presumption will be strengthened, if, after the separation, the other party to the first marriage also remarries.   8 Enc. of Ev. 463, notes and cases cited; 77 S. W. 1122; 25 Ky. Law Rep. 1356.

2.   The court erred in holding that the children of Frank Miller by his marriage with Lidmilla Miller were not his legal heirs and were not entitled to inherit any of the property of his estate.   Under our law they are entitled to inherit and share in his estate.   Kirby's Dig., § § 2536, 2640.

*Carmichael, Brooks, Powers & Rector,* for appellees, M. C. Miller, Annie Mier and A. F. Mier.

1.   As to M. C. Miller, the findings of the chancellor upon the evidence will not be disturbed unless clearly contrary to the weight of the evidence.   93 Ark. 277; 103 Ark. 473; 97 Ark. 537; 92 Ark. 30; 98 Ark. 328; 100 Ark. 370; 90 Ark. 40; 86 Ark. 212; 98 Ark. 459; 102 Ark. 102.

2.   The court found that Frank Miller and Annie Mier, or Miller, were lawfully married in the State of Texas, and that they were never divorced, and the record and the testimony bear out these findings.   The record and the testimony also bear out the court's finding that Frank Miller and Lidmilla were never married.

The court's finding that Annie Mier, or Miller, was the legal widow of Frank Miller, entitled to dower and homestead rights in his estate, is sustained by the evidence.   28 Ark. 21; 97 Ark. 272; 88 Ark. 196; 12 L. R. A. 50.

3. Recognizing that a construction of section 2640 of Kirby's Digest, and the question of the right of the children of Lidmilla and Frank Miller to inherit his estate is one of first impression in this State, counsel cite as supporting their right to inherit 5 Call (Va.) 143; 90 Va. 390; 18 S. E. (Va.) 841; Long on Dom. Rel. (2 ed.), § 244, and cases cited; 80 Va. 636, 56 Am. Rep. 601; 218 Ill. 220, 1 L. R. A. (N. S.) 773; Peck on Dom. Rel., § 104. As opposed to their right to inherit counsel cite *Sams* v. *Sams,* 85 Ky. 396, and say that this court, in the case of *Furth* v. *Furth,* 97 Ark. 275, has indicated a disposition to adopt the view headed by the *Sams* case, rather than that headed by *Stones* v. *Keeling,* 5 Call. (Va.) 143.

SMITH, J., (after stating the facts). (1-2) We think the chancellor's findings of fact are not contrary to the preponderance of the evidence. The proof shows that Anna and Frank Miller were lawfully married, and there was no proof they were ever divorced, except Lidmilla's statement that Frank had told her he had secured a divorce, and this evidence was, of course, incompetent and proved nothing; and, notwithstanding her own subsequent bigamous marriages, Anna continued to be, and at the death of Frank Miller was, his lawful wife, and entitled to her rights as such. The chancellor decreed that as Frank Miller was indebted for money which he had previously borrowed from his brother, M. C. Miller, to pay the purchase price of the lands sold to M. C. Miller, at the mortgage foreclosure, that there were no dower rights in these lands in favor of Anna Miller, although she did not join in the execution of the mortgage. But as Anna has not appealed from this decree, we are not called upon to review the correctness of that decision.

We think that the chancellor's finding that the judgment and mortgages in favor of M. C. Miller were based upon transactions had in good faith is not against the clear preponderance of the evidence. We think, too, that his holding that Lidmilla's marriage was null and void is correct, and she, therefore, has no rights in this estate,

but we do not agree that her children are excluded from the right to participate in the division of that estate.

(3)   The decision of that question involves the construction to be given section 2640 of Kirby's Digest, which reads as follows: ''The issue of all marriages deemed null in law, or dissolved by divorce, shall be deemed and considered as legitimate.'' So far as we are advised, this section has never been construed in any case decided by this court.  It will be observed that this section was brought forward from the Revised Statutes, and appears in the chapter on Descents and Distributions.   It will be observed, too, that the protection of this statute is limited to the issue of marriages.   It does not apply to the mere progeny of illicit intercourse, nor to children born of persons whose relationship is merely that of persons who are illegally cohabiting together as man and wife; it shields only children born to parents, who undertake to marry, and do marry, but whose marriage for any cause is null in law.

In the case of *Furth* v. *Furth,* 97 Ark. 272, it was said that ''even if it can be said that a present contract of marriage between a man and a woman followed by cohabitation, is valid under the common law, we hold that the common law in this respect has never obtained in this State,'' and the reason for that holding was there stated to be, that, before the common law was adopted in this State, statutes had been enacted which regulated marriages, and which prescribed the manner and form in which they might be solemnized, and that before the adoption of the common law, as a part of our jurisprudence, marriage was regarded as something more than a contract between the parties to be formed by present words of agreement to live together as husband and wife, and that such contract could not be entered into without being solemnized by some person authorized by statute to do so, and these statutes regulating and prescribing the manner and form in which marriages may be solemnized are mandatory and not directory merely.   The point involved and there decided was ''that the doctrine of so

called common-law marriages has never obtained or become a part of the laws of this State." But the marriage there sought to be upheld, as a common-law marriage, was one contracted in this State. The question was not involved and it was not decided in that case that such marriages would not be regarded as valid in the courts of this State, if valid in the State where contracted. Upon the contrary, section 5177 of Kirby's Digest provides that "All marriages contracted without this State, which would be valid by the laws of the State or county in which the same are consummated, and the parties then actually resided, shall be valid in all the courts of this State." It is true, Lidmilla gives a very unsatisfactory account of her marriage to Frank Miller, and her evidence is very similar to that given in the case of *Darling* v. *Dent,* 82 Ark. 76. As in that case, so in this, the wife was unable to state the name of the town where she was married, or the names of any person present. She did not know whether a license had been procured, but testified that a ceremony was performed by a priest, who had a book in his hand from which he read. But in this case of *Darling* v. *Dent, supra,* there was quoted the language by Judge Cooley in delivering the opinion of the Supreme Court of Michigan in *Hutchins* v. *Kimmell,* 31 Mich. 130, as follows: "Whatever be the form of the ceremony, or if all ceremony was dispensed with, if the parties agree presently to take each other for husband and wife and from that time on live professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding on the parties, which would subject them to legal penalties for a disregard of its obligations." And that case expressly held that the alleged marriage there considered, which occurred in the State of Texas, would be valid without formal ceremony, or the procurement of a marriage license, because common-law marriages were valid in Texas.

(4-5) But it does not follow that because Lidmilla's marriage was contracted in Texas, where common-law

marriages were valid, that she is entitled to the rights which inure to a lawful wife. The marriage was an unlawful one, because it was bigamous, and we quote again from the case of *Darling* v. *Dent, supra,* "While it is true that if it be shown that the relations between Darling and Mrs. Williams were illicit in the beginning the burden is upon those asserting a valid marriage agreement to show that such an agreement was afterward entered into, still there is no presumption that the relationship continued to be illicit or whether it was changed to a legal or moral status." In case of *O'Neill* v. *Davis,* 88 Ark. 196, the facts were that the parties, whose marriage was there questioned, had lived together before the man was divorced from a former wife and continued to live together after the man secured a divorce from this wife, and in the opinion by Justice BATTLE it was there said: "The continued cohabitation after the divorce does not prove that they changed their intent, which was to live together without being married. The concomitants of their illicit relations are not sufficient, by their unasserted probative force to prove that when they were at liberty to marry they embraced the opportunity. As Chief Justice Beasley said of such evidence in *Collins* v. *Voorhees,* 14 L. R. A. 364, "to treat evidence which was in all respects and to the utmost degree in accord with the original purpose, as proving, *proprio vigore,* a change of such purpose appears to be not only inadmissible according to the legal rules, but as being in logic ridiculous." And we have said there was no proof here that Frank Miller was ever divorced from Anna.

(6) At the common law all children, except the issue of lawful marriages, were illegitimate and remained so; but the harshness of this rule has been much relaxed until now, in most if not in all American States, statutes have been enacted which provide that the issue of a void or voidable marriage shall be legitimate, notwithstanding the invalidity of the marriage. Long on Domestic Relations (2 ed.), § 244, and cases there cited.

One of the earliest States to enact a statute to this effect was Virginia, where in 1785 a statute was passed which reads as follows: "The issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate." The case of *Stones* v. *Keeling,* which was decided at the May term, 1804, of the Court of Appeals of Virginia, 5 Call 143, involved the construction of this statute, and the syllabus in that case is as follows: "The issue of a woman by a second marriage, which took place during the lifetime of her husband, are legitimate after the death of their father." It was the unanimous opinion of the court in that case that the issue of the second marriage were legitimate, and in a concurring opinion by Roane, Justice, it was said: "The second marriage, therefore, was not lawful; it was even void; but we can not in this case say that it was criminal. Circumstances may exist, such as a belief of the death of the first husband, or a seven years' absence by him, which may render the second marriage even innocent. We are bound to consider this marriage innocent, for we can not, in this proceeding, inquire into its guilt. But if it were otherwise, if the Legislature should even be supposed to consider every second marriage, living a first husband or wife, as criminal, wherefore should they visit the sins of the parents upon the innocent and unoffending offspring? But this was not the temper of the Legislature. In the case of incestuous marriages, where the parties with full knowledge of the everlasting bar which does and ought to exist between them, enter into this contract, and produce an innocent offspring, in defiance of laws human or divine; where you can not suppose a circumstance of excuse, except the scarcely possible one of an ignorance of the consanguinity which exists between the parties, their offspring is not bastardized by our laws, on the contrary it is expressly provided (New Code 195, § 13) that the nullification of such marriages shall not be construed to render the issue illegitimate. * * *

"It was said by one of the appellee's counsel, that the construction I adopt is inadmissible, as tending to

encourage bigamy. It was well said in answer, by one
of the appellant's counsel, that considerations of this
kind, in relation to the offspring, form no part of the in-
ducements to marriage. But this is not all. The Legis-
lature itself has given the answer. That Legislature cer-
tainly meant not to encourage fornication, or incestuous
marriages, and yet it has expressly legitimated the off-
spring of both.''

This section of the Virginia Code remained un-
changed and was again construed by the Court of Ap-
peals of that State in 1894 in the case of *Heckert* v. *Hile's
Admr.*, 18 S. E. 841, where it was said: ''The contro-
versy in this case is between the children of Peter Hile
by a lawful wife, who left her husband and went to the
State of Michigan, and the children of said Peter Hile
by another woman, married by him during the lifetime
of his first wife, who were born before the dissolution of
the marriage of the first wife. The circuit court decreed
that the first marriage was lawful and the children legiti-
mate; that the second marriage was null, but that the
children of this null marriage were legitimate—made so
by our statute (section 2554, Virginia Code), * * * and
that the second set of children, being legitimate, inher-
ited from the father as the first set, the issue of the legal
marriage. There can be no doubt of the correctness of
this decision. The case comes within the plain provision
of the statute cited above, which is of ancient date in
this commonwealth, and was carefully considered and
construed in 1804 in this court, in the case of *Stones* v.
*Keeling*, 5 Call, 143—a decision under which we have
since rested. In that case the law was considered in
every aspect under which it should be regarded, and was
sustained and made effective. But it is contended by
counsel for the appellants that a recent case in this court
has substantially overruled *Stones* v. *Keeling*, and they
cite *Greenhow* v. *James*, 80 Va. 636, but we do not so re-
gard it. That was the case of illegitimate children of a
white person by a negro, who left the State and were
married abroad. The distinction is sufficiently drawn in

the opinion in that case; and in the case of *Stones* v. *Keeling, supra,* Judge Roane, who delivered one of the opinions in that case, does the same on page 148, saying: 'The law concerning marriages is to be construed and understood in relation to those persons only to whom that law relates, and not to a class of persons clearly not within the idea of the Legislature, when contemplating the subject of marriage and legitimacy.' The case of *Greenhow* v. *James* does not affect this case, nor the case of *Stones* v. *Keeling,* and the last named case is a distinct authority on this case, and we think, upon the plain terms of the law, and the reason of the Legislature in enacting the same, is correct. We therefore affirm the decree of the circuit court of Rockingham County.''

This section of the Virginia Code was enacted by the Legislature of Ohio, and the Supreme Court of that State adopted the construction of the Virginia court in *Ives* v. *McNicoll,* 59 Ohio Stat. 402, and in the opinion in that case it was there said: ''The statute of Ohio is a transcript of the statute of Virginia on the same subject; passed in 1785, and entitled, 'An Act concerning the course of descents.' The bill was drafted and reported by a committee, of which Thomas Jefferson was one, after some years of deliberation, and was adopted by the Virginia Legislature, omitting the exception of the civil law, and the law of Scotland, as to adulterine bastards, and disregarding the common law of England, which prevented all bastards from becoming legitimated.

''The statute of Virginia did not follow nor adopt any of the European laws as to bastards, but enacted a new statute on the subject, to be construed and enforced by reference to the words used in the statute itself, untrammeled by the rules of the civil law. The courts of Virginia, both before and after the adoption of our statute, construed the statute of that State as having abrogated the exception of the civil law as to adulterine bastards. *Stones* v. *Keeling, supra; Browne* v. *Turberville,* 2 Call, 390; *Templeman* v. *Steptoe,* 1 Munf. 339; *Davis* v. *Rowe,* 6 Rand. 355; *Garland* v. *Harrison,* 8 Leigh, 368.

When we adopted in this State the Virginia statute as to bastards, we adopted with the statute the construction placed upon it by the courts of Virgina, and at each re-enactment of the statute we acquiesced in the constructions up to that time placed upon the statute by the courts of Virginia, no construction having in the meantime been placed upon the statute by our own courts. * * * When the Legislature of this State adopted the Virginia stat-ute, in 1805, it was familiar not only with the Virginia statute, but also with the civil law, the law of Scotland, the common law of England and the Code of Napoleon, and the omission of the exception of adulterine bastards was not in ignorance of those laws, but was with the pur-pose of wiping out the exception and doing justice to the innocent offspring.''

A very similar question to the one here under con-sideration was involved in the case of *Leonard* v. *Bras-well*, 99 Ky. 528; 36 L. R. A. 707. A number of authori-ties were there reviewed and the syllabus of that case is as follows: ''The offspring of a bigamous marriage contracted in Illinois, where it is void, may, as legitimate heirs, inherit lands in Kentucky, where the parents lived, by virtue of the Kentucky statute declaring that the issue of an illegal or void marriage shall be legitimate.''

It is seen that our statute is practically a copy of the Virginia statute, and we conclude therefore that a proper construction of section 2640 of Kirby's Digest requires us to hold that the children of this second marriage are legitimate and are entitled to share as such in the divi-sion of the estate of Frank Miller.

A fee of one thousand dollars had been allowed by the chancellor to the attorney for the appellants, but later an order was made setting aside the order allowing the fee. This fee should not have been allowed, and we approve the order disallowing it. *Gardner* v. *McAuley,* 105 Ark. 439.

The decree of the chancellor will be affirmed in all respects, except in the particular indicated, as to which it is reversed, and the cause will be remanded with direc-tions to the chancellor to amend his decree accordingly.