## SIMS *v.* STOVALL.

### Opinion delivered January 29, 1917.

1. MARRIAGE AND DIVORCE—EFFECT OF SUBSEQUENT BIGAMOUS MARRIAGES OF BOTH PARTIES.—Where parties have been legally married, and have never been divorced, the contracting by both of them subsequently, of bigamous marriages, does not affect their relationship of husband and wife, and their property rights *inter se.*

2. ATTORNEY AND CLIENT—FEE—DEED TO LAND—FAILURE OF CONSIDERATION.—Appellants, having an interest in certain lands, contracted with appellees, who were lawyers, to bring legal proceedings to recover the lands for them, and executed to appellees a deed to a one-half interest in whatever lands were recovered, which was to be the fee paid appellees for their services. Appellees permitted nine months to elapse without taking any action, looking toward a recovery of the land. *Held,* the chancellor should have set aside the deed from appellants to appellees because of the failure of the consideration therefor, and that it was no defense on appellee's behalf, that appellants failed and refused to assist them in the prosecution of the claim.

3. DESCENT AND DISTRIBUTION—ASSIGNMENT OF DOWER—DUTY OF HEIRS.—It is the duty of the heirs, upon the death of the intestate, upon whom the inheritance is cast, to have dower laid off and set aside to the widow.

4. FRAUDULENT CONVEYANCES—UNDUE INFLUENCE—INADEQUATE CONSIDERATION.—A deed, executed by three ignorant negro women, to land valued at $10,000 for a consideration of $200, held invalid.

Appeal from St. Francis Chancery Court; *Edward D. Robertson*, Chancellor; reversed.

STATEMENT BY THE COURT.

This suit was instituted by appellants against the appellees to set aside a sale made by appellants to appellees, A. T. Stovall and Walter Gorman, of certain lands and personal property described in the complaint. Also to set aside deeds made by Stovall and Gorman to John W. Aven to the lands mentioned

in the complaint. Appellants sought in the same complaint to recover of Lucy Sims, and of Walter Gorman as administrator of the estate of Emmet Sims, certain personal property and rents alleged to have been received by them, same being personal property belonging to the estate of Emmet Sims, deceased.

As ground for setting aside the conveyance to Stovall and Gorman, appellants allege failure and inadequacy of consideration and fraudulent representations; also that Gorman was administrator of the estate of Emmet Sims at the time the conveyance was executed to him as grounds for setting aside their deed to John W. Aven, appellants fraudulent representations which induced them to make the deed.

After the institution of the suit John W. Aven died and the cause was revived in the name of his administrator, and his widow and two children, his only heirs at law, were made parties defendant.

The allegations of inadequacy of consideration and of fraud set up in the complaint were specifically denied by the appellees in joint and separate answers.

The facts concerning the conveyance from appellants to Stovall and Gorman are substantially as follows:

Emmet Sims, a negro, died June 6, 1912. At the time of his death he lived in St. Francis county, Arkansas. He owned an estate, consisting of personal property and lands, of the value of something over $11,000. The lands alone were worth more than $10,000. It appears that Sims, at the time of his death, was living with a negress with whom he had contracted a bigamous marriage. This negress, Lucy Sims, had two children, who were both living, and she claimed to be the legitimate wife of Emmet Sims and took possession of his real estate and personal property. Sims, before his bigamous marriage with Lucy, had married a negress by the name of Alice, who also had two daughters by Emmet Sims. These daughters were grown and married.

Alice, the widow, was 53 years old at the time of the death of Emmet Sims. She was living with and cooking for a family of white people at Okolona, Mis-

sissippi. One daughter, Henrietta Franklin, also lived near Okolona. She was working a share crop. The other daughter, Mattie Gladney, was engaged in making a share crop near Widener, in St. Francis county. After hearing of the death of her husband, Alice Sims consulted A. T. Stovall, an attorney at Okolona, Miss., concerning her interest in her husband's estate. She did not know whether she had been legally married or legally divorced. Stovall wrote to Walter Gorman, an attorney at Forrest City, Arkansas, to ascertain what the prospects were for Alice recovering the property. Gorman replied that Emmet, who had died, had a wife and several children in Arkansas. Stovall communicated this information to Alice, and agreed to take her case provided Gorman would co-operate with him on a contingent fee. Gorman agreed to take the case if the parties would convey a one-half interest in the property. On the 12th of August, 1912, Alice Sims signed a contract for herself and her two children by which she agreed, for herself and them, to give Stovall and Gorman one-half of the property that might be recovered for them. Afterwards Gorman prepared the deed in suit, in which Alice Sims and her two daughters conveyed to Walter Gorman and A. T. Stovall one-half of the lands and personal property that might be recovered of the estate of Emmet Sims. The deed recited a consideration of $10.00 paid by Stovall and Gorman, and the further consideration from them "of the services heretofore rendered and to be hereafter rendered in recovering from the estate of said Emmet Sims, deceased, whatever share or shares of said estate may be due us," etc. The deed was sent to Stovall and he procured the signatures of Alice Sims and Henrietta Franklin to same, returned it to Gorman, and Gorman procured the signature of Mattie Gladney.

Gorman stated that he treated the deed as a contract between the appellants and himself and Stovall as a fee for legal services. The deed was dated September 9, 1912, and Gorman filed the same for record

June 5, 1913. Gorman stated that he examined the marriage records in St. Francis county and found the record of a marriage between Emmet Sims and Lucy Sims in the year 1891 or 1892. Stovall examined the records in Mississippi, where Emmet Sims married Alice, and where he had formerly resided, and there was no record of any divorce having been obtained from Alice. Nor was there any such divorce shown in Arkansas.

Seven days after the contract was entered into between Alice Sims for herself and her children and Stovall and Gorman, Gorman was appointed administrator of the estate of Emmet Sims, and this appointment was approved September 2, 1912, seven days before the deed in controversy was executed.

Concerning the work that was done by Gorman and Stovall under the contract and deed, Gorman testified that as soon as the deed was executed he began at once to urge upon Alice Sims to come to Arkansas and remain long enough to prove that she was the lawful wife of Emmet Sims, and that her two children were the heirs of Sims, in order that he might recover from Lucy Sims the possession of the property. Finally, after much persuasion, Alice Sims came to Arkansas, and he fully explained to her all of her rights, if she would remain here and co-operate with him in proving that she was the lawful wife of Emmet Sims at the time of his death. This she promised to do, and on April 28, 1913, he drew up a petition to be filed in the probate court, praying an order for the administrator to pay over to her the statutory allowance as widow. This petition was signed and sworn to by her on that date. He supposed Lucy Sims would resist the petition and thus start the fight as to who was the lawful widow of Sims. Some two or three weeks after signing the petition Alice Sims appeared in witness' office a second time, and on that occasion seemed to be very much dissatisfied and anxious to return to Mississippi. She said people were telling her that if she ever won the suit the lawyers would beat her out of it and ad-

vised her to sell her share for anything she could get. She said she had a cash offer and would rather have the money and go back home than to stay in Arkansas. Witness stated that he explained to her that the estate was worth from five to six thousand dollars, and that she would share the homestead with the minor children, besides getting one-third of the personal property and a life estate in one-third of the lands. She promised that before making any sales she and her daughters would advise with witness, but none of them came about him any more. Witness inquired as to the cause of their remaining away and received information that they were about to sell their interests, and then witness had the deed in suit filed for record, to protect the interests of himself and Stovall.

Further on in his testimony he states that as soon as he was employed he went to see Lucy Sims and found her in possession of the personal property. He demanded possession, which she refused, claiming that Sims had given her the property and saying that she would not give up anything without a lawsuit. Witness made several attempts to rent out the lands and get the rent notes, but the tenants on the land all seemed to be under her control and rented from her. Witness saw no way to get possession of the property without litigation, and saw no way to prevail in litigation without the co-operation of his clients, which he failed to obtain. He further testified as follows: "Neither Stovall nor myself ever filed any suit to recover the property from Lucy Sims. I never asked Mattie Gladney, as an individual, nor Henrietta Franklin, as an individual, or jointly, to sue for the property, without joining the mother, Alice Sims, for the reason that neither Stovall nor myself had undertaken to bring such a suit. I knew without the co-operation of Alice Sims such a suit would fail. I never saw either Alice Sims nor Henrietta Franklin, nor communicated with either of them prior to the execution of the deed to me and Stovall. They were both in Mississippi and all my letters were addressed to Stovall in all matters

pertaining to them and all matters pertaining to the property."

The testimony of Stovall was to the effect that he never made any representations to the negroes to get them to sign the deed. He testified that Alice and her daughter in Mississippi were above the average negro in intelligence. Witness never represented to them that if they did not sign the deed they would not get anything. Witness, at that time, did not know whether they were going to get anything or not. After witness was employed he made an investigation of the records in Mississippi and ascertained that Emmet and Alice Sims had been married, and that there was no record of divorce. After the contract was entered into witness prevailed on Alice Sims to go to Arkansas to see Mr. Gorman. She went, but became dissatisfied and came back and represented to witness that she would rather live in Mississippi on bread and butter than to own a plantation in Arkansas. She stated that she did not like Arkansas, and, furthermore, that she was apprehensive of some harm to her from the other Sims claimants for the property. Witness rather insisted on her going back. She then insisted on selling her interest in the property to witness, but witness would not buy it. Witness did not know anything about her selling out to Aven until the deed was made. Witness reprimanded her for it, and she replied that all she wanted was money; that she did not want any land in Arkansas if she could get it, and that the money she got was "worth more to her than all the State of Arkansas." Witness stated that before Alice Sims and Henrietta Franklin seemed thoroughly satisfied with the sale they had made, and they gave witness the name of the man to whom they sold. After Alice Sims sold out witness began to negotiate with the party to whom she sold to sell, and did sell.

The testimony of the appellants shows that neither Gorman nor Stovall paid them anything as a consideration for signing the deed. Alice Sims stated that she did not know what she was signing. The testi-

mony of Henrietta Franklin was to the effect that she did not know the amount of real estate nor the amount of personal property, nor the value of either, that was owned by her father at the time of his death. She knew that he owned one place, but had never seen it. She and her mother and sister executed the deed to Stovall and Gorman about the 9th of September, 1912. Stovall said it was a copy they were signing to work for one-half. Witness did not know that it was a deed. It was not read over to her, and Stovall did not explain to her at the time as to the property mentioned in the deed or give her any idea as to the value of the property. "He told us he would work for one-half."

Mattie Gladney testified, in substance, that Gorman came to her house and asked her to come to his office to sign that paper. She went, and the paper was not read to her. Gorman did not explain to her what the paper was. She did not know that he was administrator of her father's estate until Gorman told her. She signed the paper because her sister had signed it. She did not know that it was a deed to half of her father's land and personal property. No legal services had ever been rendered for her on account of her father's estate by Gorman and Stovall. No money or personal property of her father's estate had been delivered to her by Gorman or Stovall, or any other person, and no money had been paid to her by Gorman or Stovall. Neither had they rendered or offered to render any legal services other than the deed they wrote and had appellants sign, conveying one-half of the real estate and personal property to them.

The facts concerning the execution of the quitclaim deed by the appellants to John W. Aven are as follows: The testimony of T. A. Buford, one of the witnesses for the appellees, is substantially as follows: He was a merchant at Forrest City, and was present when the deed was executed by Mattie Gladney and Alice Sims. He went there with Aven, saw some people and saw Aven give them some money. Aven met Alice Sims and Mattie Gladney before they signed the deed at the

house of Albert Gladney, the husband of Mattie
Gladney. The subject of the trade was not discussed
before they went in to sign the deed. Aven told them
he came to make them an offer for it; that he didn't
intend paying them the value of it for he didn't know
what he was getting. Witness was not in the house
three minutes. He was where he could hear any
conversation that Aven had with these darkies, but
all that was said by witness to Mattie Gladney and
Alice Sims was about Mr. Gorman. Witness asked
Alice Sims about her taxes, and she replied that Gor-
man was her attorney and would attend to it. After
they signed the papers Aven asked witness where they
could get a notary public, and witness told him that
he (witness) would get 'Squire White, who did not live
far away.' Witness continuing said: "We come to the
negroes' front door where Mr. Aven and the negroes
were; neither Mr. Aven nor I said anything to the
women to induce them to execute the deed; the deed
had been signed when Squire White came. He read it
over to them and asked them if they knew and ac-
knowledged that they had signed it, and they said
'Yes.' When Mr. Aven told Squire White to read the
deed to them he did it." Witness denied that he or
Aven said anything in the presence of the women, or
in the presence of a man by the name of House, to make
them take less than the value of the property. When
Gladney's wife signed the deed Gladney was around the
house. I told him that Aven wanted to see him.
Neither witness nor Aven said anything to frighten
them or make them believe that they would get noth-
ing unless they traded with Aven. "I don't know
anything else that is material to either party only that
the old woman and the girl Mattie, seemed more
anxious to sell the land than Aven did to buy it. The
old woman said that she had been staying in town since
Christmas trying to get something out of the land."

On cross-examination witness stated that Aven's
wife was an aunt of witness' wife. Witness further
stated: "I think I heard all that was said about it

between Aven and these women. They signed the deed before Squire White got there. I asked the old woman if the taxes had been paid, and she said the land sold for the taxes just a day or two prior to that."

Witness was asked the following question: "Did not Mr. Aven tell those negroes that it (the property) was in a lawsuit?" And answered, "He did. He told them if he won out he was going to give Sims' other wife some of it; that she was entitled to it.".

Witness further states: "We were not there over fifteen minutes all together. It seemed that Aven had an appointment with them. I heard him say that he didn't come to give them the full value of it, for he didn't know what he was getting, but that he had come to make them an offer. He told them that it was in litigation, and that it had been for about two months. I don't know whether he talked to them prior to that time or not."

Frank House, a witness for the appellants, testified as follows: "I was present at the time the deed was executed by Alice Sims and Mattie Gladney to John W. Aven. When I got there they were sitting down talking over some land, and I heard Mr. Aven say to Mattie Gladney and her mother, 'I have got $200.00 in my pocket, and I will give you that for your right, and I am giving you that at the risk of a lawsuit. If I miss getting it I just lost $200.00. I thought it would be better for you to take that than to get nothing. It would be fourteen years before you could ever have anything to do or say about this land in any way. He (Mr. Aven) asked me to go to Squire White's and have him meet him at my house to take the acknowledgment to the paper. I did that and Mattie Gladney asked me what did I think about them taking $200.00 for the place. That was just before she signed it. I told her I didn't know, that it was just up to them about that, but I thought that might beat nothing. Mr. Aven said that Mr. Gorman had already beat them out of one-half of it and he thought he would get the other half; that's why he offered them $200.00.

Mr. Aven said if he won the lawsuit he would make something, and if he got beat that was just $200.00 he lost. Just as we started away Mr. Aven told Mattie's mother to meet him at the train the next day; that he wanted her to go with him over to see the other girl, and he would keep her part of the money himself. Mr. Aven had the cash with him to pay Aunt Alice and Mattie except 40 cents. I am not related to any of the parties; have no interest in the lawsuit.''

Witness White testified as follows: "I am a justice of the peace, and was such on June 9, 1913. I know Alice Sims and Mattie Gladney and took their acknowledgment to a deed from them to John W. Aven. The persons present were Mr. Aven, T. A. Buford, Frank House, Alice Sims and Mattie Gladney. I heard a conversation between Mr. Aven and Alice Sims and Mattie Gladney on that occasion. Mr. Aven had the deed and asked them to sign it; said he would pay them $200.00, and told them that if they did not take that they were liable not to get anything; that he was doing this to keep Gorman from beating them out of the whole thing. The old woman, Alice, seemed to sign it willingly, but Mattie seemed reluctant. She asked me what I thought of it. I told her I did not know the nature or the shape they had the business in. She said she was afraid she was doing wrong in signing it. Frank House told her it was better to sign it and get that as they were sure of that much. Aven told her it was in a lawsuit and the probability was that she would be beat out of the whole thing, and that she was sure of that much. Mr. Aven seemed to be in a great hurry to get it signed. The deed I think was written by a typewriter. It was a printed form. I did not read the deed to see if Aven or anyone placed the consideration in the deed or that it was filled in when it was sent out. I did not read the deed to them, not all of it; I just read the acknowledgment. I thought they were acquainted with it. I had a conversation with Mr. Aven at the time I took the acknowledgment and he told me that old man Gorman had beat him out

of about $5,000.00, but that he had the deadwood on this; that Gorman had just beaten him to it. Mr. Aven told me in the presence of these darkies, at the time the acknowledgment to the deed was taken, that if he hadn't done this they would have been beat out of all their land, but that this much was just the same as a gift to them. Mr. Aven handed me the deed. I don't remember whether he told me to read it, but it don't seem to me that he did. I won't be positive, but I don't believe I read that part of the deed that speaks of granting the land, conveying it to Aven, the price to be paid and the land to be conveyed to him. I inquired of them if they were acquainted with the contents of the deed, and asked them if they had executed the same for the consideration freely and voluntarily. Alice said that she did. I don't think Mattie said anything. At the time I took the acknowledgment I thought I had done all that was necessary to be done in taking the acknowledgment and thought I had complied with the law."

The notary public who took Henrietta Franklin's acknowledgment to the deed testified as follows: "I don't remember of Mr. Aven saying anything to Henrietta Franklin as to the amount he was paying her, compared with the value of the property. Mr. Aven paid Henrietta Franklin the money in my presence. I heard no representations made by Mr. Aven to induce Henrietta Franklin to execute the deed. I have no knowledge of what occurred between him and the plaintiff, Henrietta Franklin, or between him and Alice Sims. My recollection is Mr. Aven requested me to read the deed to Henrietta Franklin and I read it to her. I did not make any further explanation to her touching the transaction. Alice Sims was present at the time the deed was acknowledged. The acknowledgment was taken at the home of Henrietta Franklin, about six miles south of Okolona. We went out in an open surrey from the stable. I think Alice Sims and Mr. Aven came together from Arkansas, either the day or the night before. The date written in the acknowl-

edgment is the true date on which it was taken. Mr. Aven paid Henrietta Franklin $67.00. I don't remember the exact language used by Mr. Aven."

The court excluded the testimony of Henrietta Franklin, Mattie Gladney, and of her husband, Albert Gladney, and also the testimony of Alice Sims, as to transactions with and statements made by Aven to the appellants in regard to the sale of the land in controversy and their deed to him. The appellants asked the court to consider the testimony of each of the appellants, not in their own cases, but as applicable to the cases of each other. The court refused to consider the testimony of any of the appellants as applicable to the cases of the other appellants.

The court, after hearing the evidence, found that there was no equity in the appellants' complaint, and entered a decree dismissing the same, from which this appeal was taken.

*C. W. Norton* for appellants.

1. The court erred in dismissing the complaint. The deed to Stovall and Gorman was void. They paid no consideration and the legal services which they agreed to render were never rendered. No suit was brought and no steps taken by them to recover the property the widow and heirs of Sims were entitled to. The last marriage of Sims was bigamous and his last wife was entitled to no part of the estate and this Stovall and Gordon knew.

Three ignorant and illiterate negro women were overreached and legally, at least, defrauded. They never explained to them their rights and they did not know what they were signing. It was their duty to have made a full investigation and fully explain same to and advise these ignorant parties of all their rights. The utmost good faith is required. 23 L. R. A. '(N. S.) 679; 3 McCray, 76; 78 Ark. 115; Perry on Trusts, § 195; 61 S. E. 806; 11 Paige, 538; 42 N. Y. Supp. 834; 3 A. & E. Enc. L. (2 Ed.) 332; 4 Cyc. 960; 70 Ark. 509; 84 *Id.* 575; 73 *Id.* 575; 66 *Id.* 190; 33 *Id.* 575.

2. Alice Sims, Henrietta Franklin and Mattie Gladney were competent witnesses for each other and Albert Gladney was a competent witness for Alice and Henrietta. Their evidence should not have been excluded. 80 Ark. 277; 83 *Id.* 210; 79 *Id.* 136, 414; 31 *Id.* 264; 37 *Id.* 195; 46 *Id.* 306, 378; 63 *Id.* 556; 70 *Id.* 141; 122 Ark. 227; 40 Cyc. 1190; 106 Ark. 421, 491. Lucy Sims had no interest. Kirby's Digest, § 2640; 114 Ark. 84. The badges of fraud and misrepresentation appear in every move made.

3. The deed to Aven was fraudulent and void. The consideration was grossly inadequate and Aven took undue advantage of their ignorance and the bargain was unconscionable. 101 Ark. 558; Pom. Eq. Jur. (3 Ed.) §§ 926, 928; 11 Ark. 66; 17 *Id.* 498; 74 *Id.* 259; 94 *Id.* 621; 60 Minn. 262; 107 Tenn. 572 and cases, *supra.*

4. The alleged champertous contract cannot avail appellees. 60 Ark. 277; 6 Cyc. 880; 5 Am. & E. Enc. L. (2 Ed) 830-2; 40 Kans. 195; 2 Beach Mod. Law of Conv. §§ 1541-2 and notes; 117 U. S. 582; 49 Ob. St. 1; 35 L. R. A. (N. S.) 512; 137 Ill. 652; 211 Ill. 652; 53 Iowa, 582 and many others.

5. The objections to the excluded testimony were not specific. 113 Ark. 296; 112 *Id.* 592; 86 *Id.* 138; 110 *Id.* 379; 74 *Id.* 579; 75 *Id.* 423; 98 *Id.* 352; 115 *Id.* 448; 80 *Id.* 277, and many others.

6. Gorman was the administrator of Sims' estate and a trustee and could neither buy nor sell for his own profit or advantage. 78 Ark. 115; 84 *Id.* 575; 73 *Id.* 575; 66 *Id.* 190; 33 *Id.* 575; Perry on Trusts, §§ 195, 203, etc.

*R. J. Williams* for appellees.

1. No fraud nor imposition was shown in the contract with Stovall and Gorman. Nor is any bad faith proven. The contract in view of all the facts and circumstances was only for a reasonable compensation for services to be rendered. 35 Ark. 247; 66 *Id.* 190. The utmost good faith is shown. While they were

preparing the case, appellants, without the knowledge or advice of their counsel, sold their interest to J. W. Aven.

2. Where one party to a contract renders the performance thereof impossible, performance by the other ceases to be a material element in the right of said other party for recovery on the contract; in the eye of the law in such case performance is excused. 85 Ark. 596; 102 *Id.* 152; 7 *Id.* 123.

3. As to Aven, mere inadequacy of price is not sufficient, unaccompanied by fraud or misrepresentation. 95 Ark. 523. Moreover, such fraudulent misrepresentations must be material, and with intent to have the other party act on them to his injury, and such must have been their effect. 79 Ark. 265. Mere expressions of opinion are not sufficient. 68 Ark. 98.

4. Aven owed no duty to plaintiffs and no confidential relations existed. The means of information were equally accessible to all parties. 31 Ark. 107. To avoid the contract plaintiffs must have been deceived by representations they had a right to rely upon and they must have been false and material. 26 Ark. 28; 38 *Id.* 428; 31 *Id.* 107.

5. The contract was not champertous nor against public policy. Nor did Stovall and Gorman overreach their clients. The bargain was not unconscionable and inequitable. At common law such contracts were void, but the rule has been modified. 21 Ark. 539; 17 *Id.* 608.

WOOD, J. (after stating the facts.)

(1-3) I. The court erred in dismissing appellants' complaint. The court should have cancelled the deed executed by the appellants to the appellees, Stovall and Gorman. Stovall and Gorman did not pay any money consideration for the deed, and the legal services which they agreed to render the appellants in consideration of the deed were never rendered.

The deed from appellants to Stovall and Gorman was executed on the 9th day of September, 1912.

The deed from appellants to John W. Aven was executed on the 9th day of June, 1913. It thus appears that a period of nine months elapsed after the deed of appellants to Stovall and Gorman was executed before appellants sold their interests in the land to Aven. During all this time the appellees, Stovall and Gorman, failed to institute suit or to take any steps looking to the recovery of the property belonging to the estate of Emmet Sims, which the appellants as the widow and heirs of Sims were justly entitled to.

Counsel for appellees Stovall and Gorman contend that the failure on their part to institute suit and take the other necessary steps to recover the property of the estate of Emmet Sims for the appellants was because of the failure on the part of the appellants to give appellees Gorman and Stovall their active co-operation. While appellee Gorman testified that the reason they did not institute suit to recover the property was because their clients would not co-operate with them, yet his undisputed testimony further shows that he never asked either Mattie Gladney or Henrietta Franklin, as individuals or jointly, as heirs of Emmet Sims, to sue for the property. Now, the record shows that Gorman and Stovall had made investigations to enable them to ascertain whether the appellants were entitled to the possession of the property. The negress, Lucy Sims, who was living with Emmet Sims at the time of his death, and who remained in possession of the property thereafter, had no interest whatever therein. The testimony shows that Alice Sims was the legitimate wife of Emmet Sims, and that the appellants were his children. Emmet Sims was married to Alice Sims, and although he separated from her and afterwards married Lucy Sims, this latter marriage was bigamous; for it appears that he was never divorced from Alice. After being lawfully married, and never having been divorced, even though Emmet Sims and his wife Alice separated and each thereafter contracted bigamous marriages, Emmet and Alice, nevertheless, were husband and wife at the time of Emmet's death.

In *Evatt* v. *Miller*, 114 Ark. 84, we held: "Where a man and a woman are legally married, the woman continues to be the man's wife, although she subsequently contracts a bigamous marriage with another man, and upon the death of her lawful husband, the wife is entitled to her rights as his widow. Where a man is already lawfully married and subsequently contracts a bigamous marriage with another woman, upon his death the latter has no rights in, and cannot share, in his estate."

Having ascertained that Lucy Sims had no interest whatever in the estate of Emmet Sims, it was incumbent upon the appellees Stovall and Gorman to take some steps looking to the recovery of the property for the appellants. It is no justification for a failure to carry out their contract that they claim not to have had the co-operation of their clients when the undisputed evidence shows that so far as the appellants, Henrietta Franklin and Mattie Gladney, were concerned, they did not ask for their co-operation. Even though the widow, Alice Sims, may have failed and refused to co-operate with Gorman and Stovall in an effort to recover the property, this would not justify the latter in failing to make an effort to recover the same on behalf of the children and heirs of Emmet Sims.

Upon the death of Emmet Sims the inheritance was cast upon his heirs. It was their duty to have the dower of the widow laid off and set aside. Kirby's Digest, sec. 2717.

Stovall and Gorman could have brought suit in the name of the heirs for the recovery of the possession of the property. They do not pretend that they even consulted with the heirs about it. On the contrary, their undisputed evidence shows that they did not do so. Appellants having shown that the deed was executed in consideration of services to be rendered them and that Stovall and Gorman failed to render these services, the burden was cast upon Stovall and Gorman to allege and prove facts that would show that appellants were estopped from claiming such failure of

consideration in avoidance of their deed. Appellees Stovall and Gorman have not set up estoppel against the appellants, and their own undisputed testimony shows that they have wholly failed to render the services which constituted the only consideration for which the deed was executed.

II. So far as the deed to J. W. Aven is concerned, but little need be said. The deed on its face shows that for a consideration of $200.00 appellants conveyed 158.23 acres of land and five town lots. The testimony shows that this real estate was worth, at the time of the conveyance, about $10,000.00.

The facts discovered by the testimony warrant the conclusion that Aven had ascertained that Alice Sims was exceedingly anxious to dispose of her interest in the estate of Emmet Sims. These negresses, although they could read and write a little, were nevertheless densely ignorant of their legal rights in the estate of Emmet Sims and of the value of their property. The facts warrant the conclusion that Aven took advantage of this ignorance and induced them to sell their interest to him for a grossly inadequate consideration. It is unbelieveable that appellants, if they had had full knowledge of the fact that they were the owners of the land conveyed by their deed and of its real value, would have ever consented to sell even a half interest in same to Aven for $200.00. The evidence warrants the conclusion that Aven was fully advised of the rights that they had in the property. Their title was not complicated in the least. Aven had the deed prepared and had provided himself with the exact amount which he intended to pay, and which he evidently believed the appellants would accept, before he even discussed the matter of the sale with them.

Without going into detail, it suffices to say that we are convinced, after considering only the competent evidence in the record that Aven, who was an intelligent white man, took advantage of the lack of knowledge on the part of these negresses of their property rights and of the value of their estate to drive upon

them a hard and unconscionable bargain. He imposed upon their credulity by making false representations to the effect that "if he had not done this they would have been beat out of all their land; that this much was just the same as a gift to them; that Mr. Gorman had already beat them out of one-half of it, that the property was in a lawsuit and had been for about two months, and that he was doing this to keep Gorman from beating them out of all of it," etc.

(4) This record warrants the conclusion that these ignorant and gullible negro women, when brought under the influence of a shrewd speculator and manipulator would be like "clay in the hands of the potter." Aven adroitly used them to consummate his avaricious purpose. The results could not have been otherwise attained. It may be said generally concerning the transactions between appellants and appellees Stovall and Gorman and John W. Aven that there is evidence tending to prove that after Alice Sims came to Arkansas to assist her attorneys to recover the property, the friends of Lucy Sims were threatening to send Alice to the penitentiary for alleged bigamous marriage. These threats had so wrought upon her mind that it was doubtless true, as she told her attorney, that "she would rather live in Mississippi on bread and butter than to own a plantation in Arkansas." This fact made it difficult, if not impossible, to keep Alice in Arkansas long enough for her to give her attorneys any assistance in any effort to recover the property, but it furnished no excuse, much less justification, to them for not instituting a suit for that purpose. Because, as we have seen, she was not a necessary party to such a suit, and her presence was not essential to the preservation of her own rights and the rights of the heirs. After the attorneys had ascertained the rights of their clients, they should have been only the more persistent and diligent in protecting same, in view of the demorilization of Alice Sims. The terrorized state of Alice Sims was such as to make her an easy and shining mark for the cupidity of any one who

had a covetous eye on these town lots and rich bottom lands. But for any one to take advantage of her mental attitude to deprive this illiterate negro cook and her children of their property for a mere pittance, is a fraud which a court of chancery should promptly rectify.

III.   Since Stovall and Gorman had no rights in the property which they could convey to Aven, it follows that their deeds to him were invalid and should be cancelled. The alleged champertous contract between appellants and one Walker can not avail appellees as a defense to this suit. *Prosky, et al.* v. *Clark, et al.*, 32 Nev. 441, 109 Pac. 793, 35 L. R. A. (N. S.) 512, case note; see *Burnes* v. *Scott*, 117 U. S. 582; *Courtright* v. *Burnes*, 3 McCrary C. C. 60; Anson on Con. star page 186, note; *Pennslyvania Company* v. *Lombardo*, 49 Ohio St. 1.

IV.   The decree is therefore reversed and the cause will be remanded with directions to the chancery court to cancel and set aside the conveyances of appellants to Gorman and Stovall, and Gorman and Stovall to John W. Aven, and also the conveyance of the appellants to John W. Aven, upon reimbursing his estate in the sum of $200.00 with interest at 6% from date of deed, and for such other and further proceedings as may be had according to law and not inconsistent with this opinion.