## E. EDELSTEIN V. J. M. BROWN ET AL.

Decided April 27, 1904.

**1.—Illicit Relations—Presumption—Burden of Proof.**

The presumption is that illicit relations between parties, one of whom is married, continued illicit after dissolution of the marriage, and where it is sought to show that the illicit relations have changed to legal ones the burden rests upon the one attempting to show such change.

**2.—Same—Common Law Marriage—Community Property.**

Illicit relations began between parties while the woman had a lawful husband living and continued after his death, the parties living apart and seeing each other only occasionally. These relations existed for several years until they finally took up their abode together and represented themselves as man and wife. Such state of facts held insufficient to show a common law marriage, at least until they agreed to live together, and heirs of the woman by a former legal marriage could not recover any interest in land as community acquired before such agreement.

### ON MOTION FOR REHEARING.

**3.—Common Law Marriage—Presumption—Cases Explained.**

Yates v. Houston, 3 Texas, 442; Bonds v. Foster, 36 Texas, 68; Bull v. Bull, 29 Texas Civ. App., 364, explained as in harmony with the rule that where the original relations between parties were illicit a change in that relationship must be shown before the presumption of a common law marriage can arise.

Appeal from the District Court of Camp. Tried below before Hon. J. M. Talbot.

*M. M. Smith, E. A. King,* and *Morris & Crow,* for appellant.

*W. R. Heath* and *Sam D. Snodgrass,* for appellees.

FLY, ASSOCIATE JUSTICE.—This is a suit instituted by J. M. Brown and L. B. Brown against appellant to recover their mother's (S. C. Edelstein's) community interest in certain property held by appellant. Appellant answered denying that he had ever been married to S. C. Edelstein. The case was tried without a jury and judgment rendered for appellees.

Appellees are the offspring of Mrs. Edelstein's marriage with J. H. Brown, from whom she was divorced on February 9, 1889. On March 24, 1889, she was married to Charles Kraus, from whom she was divorced on June 19, 1890, and on September 30, 1891, she married Charles E. Rupp, from whom she separated in about three months. She obtained a divorce from Rupp on December 16, 1895. During the latter part of 1893 and in 1894 and 1895 S. C. Edelstein lived in San Antonio, Waco, and Dallas, and during the years 1896, 1897 and part of 1898 she lived in Waco and Marlin. In all of these places she was visited by appellant and they occupied the same room and cohabited with each other. In all of those places before and after the divorce was obtained from Rupp, appellant and Edelstein held themselves out as man and wife. In the fall of 1898 Mrs. S. C. Edelstein moved to Pittsburg

and took up her abode with appellant and they lived together as man and wife until her death. Appellant introduced her as his wife in Pittsburg, had real estate conveyed to her, and had her to join him in the conveyance of real estate as his wife. She was known as Mrs. Edelstein in San Antonio and other places before she obtained her last divorce and continued to be known by that name after the divorce.

During all the years from the time of appellant's first intimacy with Mrs. Edelstein he was a citizen of Camp County, and resided and did business in Pittsburg, but paid numerous visists to Mrs. Edelstein in the different places in which she lived and cohabited with her. Mrs. Edelstein died on November 22, 1902. Appellant closed out his business in May, 1903. The trial judge found that a common law marriage existed between appellant and the woman from the time that the divorce was granted on December 16, 1895, until her death.

Marriage is a civil contract, the consent of the parties to it being all that is required by natural public law. It is true that in most if not all of the States of the Union there are statutes regulating the manner of forming the marriage contract providing for the performance of ceremonies, and naming those persons who can perform the ceremonies or celebrate the rites of matrimony, but it is held in a number of the States that in the absence of positive statutes declaring all marriages void that are not performed as directed by law, any marriage made according to the common law would be a valid marriage. Such marriages may be proved by reputation, declarations and conduct of the parties, and other circumstances usually accompanying that relation. That they addressed and introduced each other as man and wife, their reception among their associates as such, joining each other as man and wife in the conveyance of property, the assumption by the woman of the man's name and their cohabitation, among other circumstances, form evidences of marriage.

To constitute a common law marriage there must be an agreement express or implied to become man and wife and while cohabitation is one of the evidences of marriage, cohabitation without the agreement to become man and wife does not raise that relation. Without such agreement antedating it, it is unlawful and does not form a part of the marriage contract. Illicit intercourse, although extending over a long period of time, does not consummate nor perfect a marriage dependent for completion on cohabitation. Rodg. on Dom. Rel., sec. 96; Cuneo v. De Cuneo, 24 Texas Civ. App., 436, 59 S. W. Rep., 284.

The law, as construed in Texas, will indulge every reasonable presumption in favor of marriage and legitimate cohabitation, but it is the rule that the presumption does not obtain where the relations of the parties originate in immorality and shame. When persons take up a relation to each other in violation of decency and the demands of society the law will not stultify itself by presuming a marriage in the absence of affirmative proof that they have repented of their conduct and have changed the character of their cohabitation either by a statutory marriage or an agreement to assume the relation of man and wife. Nor

is the presumption of a continuance of the illicit relations affected by a removal of a disability of marriage which existed when the relations began, unless there is a visible change in the manner of living. Where it is sought to show that the illicit relations have changed to legal ones the burden rests upon the party attempting to show such change. Rodg. on Dom. Rel., sec. 99.

The evidence clearly showed that S. C. Edelstein was the paramour of appellant for at least two years before she obtained the divorce, whom he visited in the different cities in which she sojourned. According to the testimony of one of the appellees, he visited his mother in San Antonio in 1893 and found her living with Edelstein as his wife, and he said from that time she was called Mrs. Edelstein. This was at a time when she was the wife of Rupp. Shortly after that time she removed to Dallas, where she lived until 1895, when she went to Waco. She then moved to Marlin, where she stayed until the fall of 1898, when she went to Pittsburg. Before the divorce appellant went to see her frequently and spent two or three days with her and afterwards there was no change. They represented that they were man and wife before the divorce was granted, just as they did afterwards. Appellant's visits to Mrs. Edelstein were made about once a month.

The first evidence of a change from the illicit relations existing between the parties was when Mrs. Edelstein moved to Pittsburg, in 1898. Up to that time there was nothing to indicate that they desired to mend the error of their way, forsake the shameful lives they had been living, and repair their wrong so far as they could by entering into the marriage relation. The relations had been conceived in sin, and continued in utter disregard of the laws of the State for years. There was no break in the tenor of their lives after the divorce to indicate that it had been procured for the purpose of marriage. That it was not so intended appears from the fact that they lived at a distance from each other, contrary to the usual habit and custom of married people. Their mode of life must necessarily carry with it such a grave suspicion as to its continuance in the illicit manner in which it began that those seeking to show a common law marriage must be required to prove more than declarations of the parties and cohabitation to accomplish the result. The only reason that was offered for the parties living in different towns was that a house could not be procured, which was received from the mouth of Mrs. Edelstein while in Dallas. To sustain that reason it must be accepted as a fact that there was such a rush for houses in Pittsburg for three years that one of its citizens was compelled to keep his wife in several cities in Texas away from his home because he could not obtain a house there. There was no attempt to prove that such a condition of affairs existed. Every reasonable presumption should, in the interest of morality, be indulged in to support the marriage relation, but the doctrine can not be carried to such an extent as to transform the position of the mistress into the honorable

status of the wife. If there were children whose legitimacy was to be protected the law would look with tender compassion upon them and might not be so exacting in requiring proof of a change from an illicit to a legal relation, but it is only a question of money which the children are endeavoring to obtain from the surviving party. The very doctrine of community property had its inception in the theory that the man and wife are equal partners in the business of life and the acquired property is the product of their joint labors. No such theory has much to sustain it in this case prior to the latter part of 1898, when the parties appear to have turned their backs upon their lives of shame and to have assumed a decent relation towards each other.

The common law idea of making marriage of a connection which, although not denounced as unlawful by the statute on marriage, is in contempt and utter disregard of its requirements, has been carried far enough when all the evidence tends to prove a case upon which a presumption of marriage may be based, and to tolerate a loose system in regard to the matter will not have the effect desired by the doctrine of the common law, the protection of the offspring and the sustaining of the marriage relation, but will rob marriage of its sanctity and enthrone lewdness in the position sacredly held by the wife and lawful mother. When all form and public ceremony is abolished, and the woman who ignores the law and demands of society by cohabitating with a man is put upon the level of the pure and upright wife and mother, the marriage contract becomes one of little importance and less sacredness, to be set aside as easily as it was assumed. Property rights will be disturbed and their tenure made to hang in uncertainty and doubt. The fear of these results has caused the legislatures and courts of a number of the States to denounce common law marriages and permit none to stand except those entered into with the formalities prescribed by statute. Rodg. on Dom. Rel., sec. 91, and note 2. The writer of this opinion is of the belief that the rule in those States is the safer plan, and as an original proposition would not accede to the common law doctrine. Even with the common law rule indorsed by the courts of Texas, it will be the policy of this court to require strict and clear proof of marriage consummated in any other mode than by a compliance with our statutes.

There is no evidence tending to show that the parties supposed that they were married. Mrs. Edelstein had been so often married according to the statute that she must have known that her relation with Edelstein was obnoxious to law and decency. One witness swore that she said she had been married to appellant. If the parties knew that the relation was not that of marriage they could not have intended it to be marriage. If marriage was not intended by them, if their minds did not meet on that proposition, they were not man and wife. Cross v. Cross (Mich.), 21 N. W. Rep., 309.

In the case above cited the man had introduced the woman as his wife and treated her as such and a child had been born to them. But

there was secrecy and a living apart for a time, and there were other facts inconsistent with marriage. The court said: "We can not avoid the conclusion that whatever these parties may have done to keep up appearances, neither of them ever supposed they were married. Their relations were evidently more intimate than those of unmarried persons should be, but they did not produce, even among strangers and other third persons, any general conviction that they were husband and wife. The real question is how they themselves regarded their relation, and reputation is only important as circumstantial evidence of this." The above language is quoted and approved in the case of Terry v. White (Minn.), 59 N. W. Rep., 1013.

As bearing upon the facts of this case we refer to the following authorities, in addition to those already cited: Appeal of Reading Ins. Co. (Pa.), 6 Atl. Rep., 50; Collins v. Voorhes (N. J.), 22 Atl. Rep., 1054; Jackson v. Jackson (Md.), 3 Atl. Rep., 758; Gall v. Gall (N. Y.), 21 N. E. Rep., 106; Voorhees v. Voorhees (N. J.), 19 Atl. Rep., 172.

We are of the opinion that the facts of this case do not prove a marriage between appellant and Mrs. Rupp, at least until the fall of 1898, when she went to Pittsburg to live with him, and no property acquired before that time had the community character stamped upon it.

If there were testimony which would enable this court to separate the property acquired after Mrs. Edelstein moved to Pittsburg from that acquired before, we might render such judgment as the trial court should have rendered, but the record does not supply the data upon which to base a judgment.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

### ON MOTION FOR REHEARING.

The testimony of one of the appellees sustains the conclusion of this court that the relation between appellant and Mrs. Edelstein began at a time when Rupp, her lawful husband, was living, and that this relation continued until the latter part of 1895, over two years. There was nothing to indicate a change in that relation after the divorce was granted, and we adhere to the opinion that where the proof shows that the original relation was criminal there must be some evidence of a change in that relationship before the presumption of a common law marriage can arise. The facts in the cases cited by appellees, as holding a contrary doctrine, do not bring them in the class of case under consideration, as we think a brief review of them will show.

In the case of Yates v. Houston, 3 Texas, 442, the woman supposed she was legally married, and there was no evidence that the first wife was living when the couple began cohabitation and the presumption was held to prevail that she was dead at that time. At the time that the man and woman moved to Texas all the evidence indicated that they

were married, and the court held that it was not proper to go back of the time when they first lived in the colony to ascertain their relation. The court did not hold that there should not be some evidence of a change from the illicit relations, if they ever existed, but hold that there was such evidence.

The case of Bonds v. Foster, 36 Texas, 68, was evidently not well considered, and the facts do not place it on a footing with this. That case goes to the extent of declaring that a common law marriage contracted between a white man and a negro woman in Ohio was legal in Texas under the fourteenth amendment to the Federal Constitution, although it was a felony for a white person and negro to intermarry in Texas, or to continue to cohabit with each other in this State when married in another State.

In the case of Bull v. Bull, 29 Texas Civ. App., 364, 68 S. W. Rep., 727, decided by the Court of Civil Appeals of the Second District, the woman, believing that she had been divorced by the laws of Alabama from her former husband, married another man. There is not a word in that decision that can be tortured into a ruling that a relation begun in disregard of law will be presumed to have changed its character without some evidence to indicate such change.

The evidence shows unquestionably that appellant at no time from 1893 to 1902, when his wife died, changed his residence from Pittsburg to any other point. The evidence indicates no change in their relations to each other until she removed to Pittsburg, if it ever did take place. One of the appellees, a son of Mrs. Edelstein, testified as follows: "During her residence in San Antonio and Dallas I understood they were married. E. Edelstein visited her frequently at those places, and would remain a few days at each visit, and would return to his place of business at Pittsburg, Texas." Again the witness said: "In the latter part of 1893 my mother was living in San Antonio, Texas, with a Mrs. Kitchens, and I was in Houston, Texas, at that time. I received a letter from her to come home. I went and found the defendant and my mother living together as man and wife at San Antonio, from which time she was called and known as Mrs. Edelstein. She lived a short time after this in San Antonio and moved to Dallas, Texas, where she lived till some time in 1895, when she moved to Waco. During her said residence in San Antonio, Waco, Marlin and Dallas, I understood that they were married. E. Edelstein, the defendant, visited her frequently at those places, and would remain a few days at each visit, and would return to his place of business." This comprised all of the time up to the time when Mrs. Edelstein moved to Pittsburg in 1898. It is true that the witness stated that they kept house after the removal from Dallas, but the visits to her by Edelstein were made just as they were when she boarded, and during at least one-third of the time Mrs. Edelstein had a legal husband in the person of Rupp. Another witness for appellees, V. C. Saufley, testified that he worked for appellant in Pittsburg up to 1898, and that he often

heard him speak of his wife who lived in Waco and Marlin, which clearly indicates that appellant was a resident of Pittsburg. It was also shown that frequent letters were written by appellant to Mrs. Edelstein at Waco. They were mailed at Pittsburg.

Mrs. Sims, who testified as to the reason given by Mrs. Edelstein for not living with appellant in Pittsburg, was a witness for appellees, and the testimony was given in response to questions addressed to her by appellees. Her evidence was not contradicted, and must be taken as true.

The foregoing was testimony offered by appellees, and in addition thereto appellant swore that he was never married to Mrs. Edelstein, and that they never at any time agreed to be man and wife, and that he knew and visited and cohabited with her. As late as 1902, a short time before her death, Mrs. Edelstein told Mrs. Monzison that she was not married to appellant, and asked if witness could suggest some way in which she could induce appellant to marry her. This court has gone to the utmost bounds in sustaining the marriage relation between the parties when it intimated that the marriage relation may have begun when Mrs. Edelstein took up her residence in Pittsburg. The sanctity of the marriage relation is so essential to the preservation of morality and decent government that it is with hesitation that this court goes to that extent.

This court is requested by appellees to take the evidence of one of them as settling the character of the property held by appellant. In view of the fact that other testimony shows that appellant must have paid for some of the property purchased by him after Mrs. Edelstein moved to Pittsburg, with separate funds, we can not hold that the witness was right in his deductions and the matter is left in such doubt that we can not determine what of the property belonged to the community.

The motion for rehearing as well as the motion for additional conclusions of fact are overruled.

*Overruled.*