ORSBURN *v.* GRAVES.

4-8534
210 S. W. 2d 496

Opinion delivered June 14, 1948.

*Buzbee, Harrison & Wright,* for appellant.

*G. W. Lookadoo,* for appellee.

GRIFFIN SMITH, Chief Justice. If appellee is the widow of William Graves, then admittedly she is entitled to an award denied by Workmen's Compensation Commission; and Associated Indemnity Corporation, as carrier of the risk, must pay. The Commission, in its consideration of facts, found that the relationship of husband and wife did not exist, and then held, as a matter of law, that Act 319 of 1939 did not apply, the term "widow" having been limited" . . . to the decedent's wife living with or dependent for support upon [the employe] at the time of his death." Circuit Court reversed and ordered payment.

The injury causing death occurred October 31, 1945. Liability was admitted, but when Mary Graves claimed benefits accruing to a widow it was shown to the Commission's satisfaction that the marriage upon which she relied must have been bigamous, hence void.

Claimant, as a witness, testified that her marriage to William Graves occurred on a farm in Texas—a place called Blossom Prairie. The ceremony was performed by a white man, but the witness didn't know whether he was a preacher or a Justice of the Peace. Only three were present when the transaction occurred, Mary, William, and the person who officiated; and the date was May 15, 1923.

But Mary admitted that during the preceding year she had married Charles Debrow in Miller County, Arkansas. She had never taken any steps to annul the

marriage or procure a divorce, and so far as she knew Debrow had not. No papers of any description had been served on her, nor had she signed anything relating to a divorce. According to Mary's life-story, she and Debrow lived together but a short time. However, after the separation Debrow continued to live at Lost Prairie, near Texarkana. He was killed by a stroke of lightning while plowing in 1930. In the meantime, however—according to Mary's claims—Debrow had married another, or at least that was the understanding. Before Mary and Debrow married in 1922 they had two children— George, born in 1916, and Willie, born a year later; and, said the witness, "I had another child, Lena Mae Wells, but I just don't know when she was born. She is now eighteen." [Since the deposition was taken in October 1946, Lena Mae was born in 1928 if her age was correctly given].

Testifying further, Mary said that Lena Mae's father was Isom Wells, but "Lena Mae was born after Debrow and I separated."

Catherine Smith testified that she "courted" Charles Debrow four years, then "married" him in November 1927. He was living at Lost Prairie in Miller County from the time she first knew him until 1930, when he was killed. Her family moved to Lost Prairie in 1922, and she had known Charles since that time.

Question: "Did Charles say anything to you about having [procured] a divorce: did he tell you he was married to anyone?" A. "I am going to tell the truth, I don't want to make a mistake. I don't know." Later the witness said that Debrow told her he "had a divorce."

Cecil Orsburn, by whom William Graves was employed at Okolona when the accident resulting in Graves' death occurred, testified that Mary and William lived together, "and I think since 1923." He thought they were married.

The overwhelming weight of evidence is that Debrow, before and after marrying Mary, lived in Miller County, and that he was not divorced there.

It is urged, however, that testimony by Catherine Smith Debrow that she was married to Charles, and his statement respecting a divorce—insistence is that this and other evidence of conduct and community understanding were sufficient to raise a presumption that Debrow would not have married Catherine without divorcing Mary, hence Circuit Court was justified in finding, (a) that proof was insufficient to show that Debrow had not divorced Mary, this, in part, upon the showing that Charles was quoted by Catherine as having said he was divorced, and the Court thought Debrow might have procured a divorce in some county other than Miller; (b) because the record was "silent as to transactions subsequent to the death of Debrow in respect to Mary's relations with Graves, there is a legal presumption that they married after 1930."

It will be observed that in both instances, (a) and (b), the Court passed upon the weight of evidence, then applied legal conclusions. But the Commission, whose duty it is to weigh the evidence, had appraised the same factual matters, and from substantial evidence concluded (a) that there was not sufficient proof to show that Debrow had divorced Mary, and (b) the record was affirmative on transactions affecting Mary and Graves after 1930.

By the plaintiff's own testimony "William and Mary [I think] had been living together ever since they [came to Okolona in 1923"]. This was said by Cecil Orsburn, for whom Graves was working at the time he was killed. If Graves and Mary had been in Arkansas since 1923, the relationship had its inception shortly before or soon after the alleged marriage between Mary and Graves in Texas. This so-called common law marriage at Blossom Prairie was of no effect. Catherine Smith does not claim to have married Debrow until 1927—four years after Mary (who admittedly was Debrow's wife in 1922) made contact with Graves. There is not a scintilla of evidence that Debrow divorced Mary *between* 1922 and May 15, 1923.

If, as the plaintiff proved, she and Graves lived at Okolona from 1923, she was a resident of Clark County

during the entire period in question, excepting, perhaps, the fraction of a year in Texas. The evidence is overwhelming—that Debrow remained in Miller County; and, while proof of a subsequent marriage creates a presumption of divorce, there is no inference or presumption that an illegal divorce was procured. Since Debrow was at all times a resident of Miller County, he could not legally invoke the aid of a different jurisdiction. Pope's Digest, "Venue," Sec. 4383.

In *Edelstein* v. *Brown et al.*, 35 Tex. Civ. App. 625, 80 S. W. 1027. Texas Court of Civil Appeals, it was held that where cohabitation was begun at a time when the woman was the wife of another, and there was no evidence of any subsequent change in their intentions as to the relationship existing between them, the fact that after the woman secured a divorce the cohabiting .couple held themselves out as husband and wife was not sufficient to establish a common law marriage. Mr. Justice FLY, who wrote the Texas court's opinion, referred to Edelstein as the woman's "paramour," rather than her common law husband.[1]

While Arkansas recognizes a valid common law marriage—that is, one consummated in a state authorizing that procedure—the recognition is accorded because, to do otherwise, there would inevitably be involved a denial of full faith and credit.[2]

Keezer, in his work on Marriage and Divorce, Third Edition, by Moreland, says that growing unpopularity of common law marriage is shown by the fact that in the last decade it has ceased to exist in Delaware, Minnesota, Nebraska, Nevada, and New Jersey by express prohibitory legislation, and it has been disapproved by the Supreme Court of Wyoming, while other courts have

---

[1] On the question of presumptions, see *Lathan* v. *Lathan*, 175 Ark. 1037, 1 S. W. 2d 67; *Goset* v. *Goset*, 112 Ark. 47, 164 S. W. 759, L. R. A. 1916C, 707; *Gray* v. *Gray*, 199 Ark. 152, 133 S. W. 2d 874; *Martin* v. *Martin*, 212 Ark. 204, 205 S. W. 2d 189; *Brotherhood of Railroad Trainmen* v. *Fountaine*, 155 Ark. 578, 245 S. W. 17.

[2] Common law marriages are authorized in eighteen states: Alabama, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Michigan, Mississippi, Montana, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, and Texas.

depricated its existence. It was abolished in England in 1753—more than a decade prior to publication of the first two volumes of Blackstone in which that great law commentator characterized marriage, as viewed by English law, ''in no other light than a civil contract.'' It is not authorized generally among other peoples, and was abolished by the Catholic Church at the Council of Trent in 1563. In conclusion it is said: ''The pioneer conditions which fostered common-law marriage in the United States have disappeared, except perhaps in Alaska, which does not authorize such marriage. The clerk's office is available to all, and none are beyond the sound of church bells. If reason be the life of the law it would appear wise to abolish common-law marriage everywhere in the United States by individual action in the several states in which it still enjoys a tenuous hold, for its continuance seems to promise more abuse than use.''

We have consistently held that in determining questions of fact discretion of the Compensation Commission will not be disturbed in making or denying an award if action is based upon substantial evidence. In the case at bar we think there was proof abundant that an invalid ''marriage'' did not entitle appellee to the consideration she contends for; hence the judgment must be reversed and the Commission's order reinstated.