BRUNO v. BRUNO.

5-10

256 S. W. 2d 341

Opinion delivered March 16, 1953.

Rehearing denied April 20, 1953.

760

*Milton McLees,* for appellant.

*O. W. (Pete) Wiggins, House, Moses & Holmes* and *William M. Clark,* for appellee.

WARD, Justice. The suit for divorce brought by appellee against appellant presents for our consideration, on this appeal, the force and effect of an alleged "ceremonial" marriage of the two parties in 1946 in the state of New York.

First, a summary of the factual background to this proceeding will help to clarify that which follows. In 1944 appellee, Frances Riffle Bruno (then Frances Shelby) was married to Roy E. Shelby and was living with him in Little Rock.

In the latter part of 1944 Roy E. Shelby entered the Army, and in October, 1944, he was sent overseas, leaving his wife in Little Rock. About the same time appellant, Vincent Bruno, who lived with his wife, Rose, in Milford, Connecticut, was sent to an army camp near Little Rock. Within a few weeks after appellant's arrival in Little Rock, he and appellee became acquainted and started going together. Following this they consorted regularly, each knowing full well the marital

status of the other. Eleven months after appellee's husband left, she gave birth to a child which she says is the son of appellant. Appellant was discharged from the Army in November of 1945 and apparently returned to Little Rock. He stayed with appellee until after Xmas, and then went to his home and wife in Milford, Connecticut. On February 27, 1946, appellee secured a divorce from Roy E. Shelby and on Easter Sunday that year she landed in the City of New York, with the child above mentioned, to visit appellant where he was then living with his parents. The reason why appellant was at that time living with his parents and not with his wife at Milford was, he says, because appellee sent a telegram to him at Milford asking what to do about the boy, and the telegram was read to his wife over the phone. Appellee admits sending the telegram to Milford. The facts are in dispute as to whether appellant invited appellee to New York and sent her the money to make the trip, or whether the trip was her own idea. At any rate appellee stayed with appellant in his parents' home from Easter 'till July 14, 1946, during which time they lived together as man and wife.

Some few weeks after appellee arrived in New York, according to her testimony, she and appellant were married in a ''ceremony'' which took place one Monday night in the basement of a restaurant. Appellant denies that any such ceremony took place.

Following the alleged marriage and for some months thereafter appellant, appellee, and the child all lived together in Little Rock up until shortly before this proceeding was begun on July 12, 1951, during all of which time appellant and appellee lived together ostensibly as man and wife. Apparently nothing was left undone by either party to let their friends and neighbors think they were husband and wife.

Some difficulty, not clearly established by the evidence, arose and appellee filed suit for divorce against appellant. Appellant defended on the ground that they were never legally married and that, therefore, an action for divorce would not lie. The lower court was of the

view that the evidence was sufficient to establish a marriage in New York, and granted a divorce to appellee. Other matters were involved in the trial court's finding but they will be discussed later.

Much could be said pro and con in regard to the fact question of whether any marriage "ceremony" took place in New York, and the same could be said about the legal effect of such "ceremony" if it in fact occurred. If the "ceremony" did not in fact take place then, of course, appellee's suit should have been dismissed. On this point, however, we are of the opinion that the chancellor's finding was not against the weight of the evidence, but, in view of the decision hereinafter announced, it is not necessary to elaborate on the questions above suggested.

We have come to the conclusion that this cause must be reversed because the evidence, as we see it, fails to show appellant was divorced from his wife, Rose, when the "ceremony" took place in New York. We arrive at this conclusion after carefully considering all the evidence introduced on this point, some of which will be set out, and after giving appellee the benefit of all legal presumptions to which she is entitled. It must be conceded that if appellant was married to Rose when he married appellee, then the second marriage was a nullity and appellee never was the legal wife of appellant. See *Evatt* v. *Miller,* 114 Ark. 84, 169 S. W. 817, L. R. A. 1916C, 759.

The evidence fails to support a finding that appellant was divorced from Rose when the ceremony took place in New York. The undisputed evidence shows that appellee knew that appellant was not divorced when she went to New York on Easter Sunday, 1946, and she also knew that Rose was living in Milford, Connecticut, because she had sent a telegram there and she later learned Rose read the telegram. Appellee knew, some weeks after arrival, that appellant was not divorced because she said appellant's sister told her so, and she admits knowing this to be a fact. It is impossible to determine just how many days this was before the ceremony be-

cause appellee did not remember when it took place, but by the most favorable calculation it could not have been many days. During these intervening few days appellant didn't leave New York and it is not contended he made any effort anywhere to get a divorce, excepting only a circumstance we now discuss. Appellee testified that while she was in New York appellant told her he had a Mexican divorce from Rose. Appellant denies making this statement and the circumstances do not corroborate appellee. Appellee testified she had announced her intention of returning to Little Rock when appellant mentioned the Mexican divorce. When asked, on cross-examination, to explain, she answered:

"A. He said he was going to some friend of his that he knew that would give him a Mexican divorce and I don't even know this friend. I believe it is Cafairo—something like that. I tell you I am under oath, I don't really know but that is what he told me."

Some days later, she testified, he told her on Saturday night he had a Mexican divorce and the "ceremony" took place the following Monday night.

There is other testimony which tends either to discredit appellee's testimony regarding the Mexican divorce or to show she didn't have much faith in the verity of appellant's alleged statement. Appellant testified, not denied, that after they returned to Little Rock they went to Hot Springs to see a lawyer about getting a divorce from Rose. One of appellant's employees said that shortly before this suit was filed appellee told him that she thought she would succeed in getting appellant to marry her if she treated him right. Also, shortly before the filing of this suit appellant went to Alabama, evidently with appellee's knowledge and consent, and secured a "purported" divorce from Rose.

Appellee explains these inconsistencies by saying their purpose was to avoid all possibilities of error and to have another marriage ceremony in her own religious faith.

In our judgment the testimony falls far short of proving appellant was divorced from Rose when the ceremony took place in New York.

Appellee contends, however, that this determination of the issue is not fair to her because it deprives her of certain presumptions of law. One presumption, plainly recognized in many of our decisions, is to the effect that where a man and woman have lived together for any considerable time, holding each other out to the public as husband and wife, a strong presumption arises that they were lawfully married and the burden is on the one claiming otherwise to prove there was no such marriage. It is not necessary to discuss the application of this presumption here because this decision gives her the full benefit of it inasmuch as the ceremony or marriage is treated as an established fact.

Another presumption, more applicable here, is to this effect: Generally, it is held that where a man and woman are married and it is later discovered that one of them has a living former spouse it will be presumed, in the absence of proof to the contrary, that the former spouse had been divorced at the time of the said marriage. The basis of this presumption seems to be twofold. First, there is a presumption against deliberate bigamy and, second, public policy forbids illegitimizing innocent children born in wedlock. See *Lathan* v. *Lathan,* 175 Ark. 1037, 1 S. W. 2d 67; *Estes* v. *Merrill,* 121 Ark. 361, 181 S. W. 136, and *Brotherhood R. R. Trainmen* v. *Merideth,* 146 Ark. 140, 225 S. W. 337. The first and last cases above cited also hold that the burden of disproving the validity of a marriage is on the one attacking it. It was also stated in the *Lathan* case that the presumption of legality of a marriage increases with the lapse of time.

The principles announced above when properly applied to the facts of this case fail, in our judgment, to justify a finding that appellant was divorced from Rose when he "married" appellee in New York. Certainly there was no considerable lapse of time [to strengthen the presumption] between the date when appellee admits

she knew appellant was not divorced and the date when she says they were married. Any Mexican divorce which appellant might have tried to secure during the short interval in which he was never out of New York would manifestly have been illegal, and the purported marriage a few days later would raise no presumption of an illegal divorce. In this same connection and under circumstances more favorable than appellee's position here, in *Orsburn* v. *Graves,* 213 Ark. 727, 210 S. W. 2d 496, it was stated: ". . . there is no inference or presumption that an illegal divorce was procured." In the same case it was held that where cohabitation began in adultery, subsequent living together as husband and wife did not raise a presumption of the validity of a former marriage.

Under the peculiar circumstances of this case, it is questionable whether the burden was on appellant to prove there was no divorce from Rose when he married appellee, but it is not necessary to pass on that question because, in our opinion, such burden, if any existed, has been overcome by the evidence.

Under the holding in *Evatt* v. *Miller,* 114 Ark. 84, 169 S. W. 817, cited above, and in the case of *Cooper* v. *McCoy,* 116 Ark. 501, 173 S. W. 412, the marriage between these parties in New York was void because appellant at the time had a living wife from whom he was not divorced. Under the holding in the last cited case appellee is entitled to no part of appellant's property as his wife.

However, under the holding of the *Cooper* case and under § 61-104, *Ark. Stats.,* the two children are legitimatized as a result of the ceremonial marriage, and can inherit from their father.

It would be in order, if requested, for the trial court to nullify the ceremonial marriage and declare the children to be legitimate, and this cause is remanded so that such action may be taken.

Reversed and remanded.

The Chief Justice and Justice ROBINSON dissent.

GRIFFIN SMITH, Chief Justice, dissenting. The factual background, when weighed by the preponderating evidence rule, is not the test here. The testimony abundantly supports appellant's assertions that her husband told her he was divorced. We may even disregard these statements and assume that he did not mention the subject: still public policy demands that when a wedding occurs each party be legally competent to contract. In the majority opinion it is conceded that a factual issue was presented when contradictory statements of the wayward couple relating to the New York ceremony was presented; but the former spouse of neither is complaining, and admittedly the situation is one where a party to a crime, if such occurred, asks a court of equity to relieve him from the consequences of his own wrongdoing.

No documentary evidence supports appellant on the vital issues, hence we have the word of philandering Jimmie to weigh against the declarations of an imprudent and from the worldly standpoint immoral mother. Man's measure of condemnation has ever been severe, but the tenets of equity, based upon precepts of Christianity, have measurably ameliorated the masculine concept of a double standard through substitution of forgiveness and a kindly spirit. It is not a waste of time to read the Gospel According to St. John, chapter four, and consider the situation of the Woman at the Well.

Where children are involved and the result of ignoring the presumption to which reference has been made is to brand them with the social status of illegitimacy, I would accept the presumption as an attribute of Right, and compel the admitted father to recognize his children without painting them with the brush of parental wrong.

The record conclusively shows that this unfeeling father pursued the willing Mrs. Shelby almost from the hour of their first meeting. Her physical attractions were the consummation of desire. The possessory urge was of such a nature that social conventions were disregarded. Now, with passion satiated, the object of his solicitude becomes the Woman of Samaria.