Cite as 2024 Ark. App. 210

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-23-127

| | | |
|---|---|---|
| MARILYN BUCKLEY | APPELLANT | Opinion Delivered March 27, 2024 |
| V. | | APPEAL FROM THE CLARK COUNTY CIRCUIT COURT [NO. 10DR-20-162] |
| FREDDIE BUCKLEY | APPELLEE | HONORABLE BLAKE BATSON, JUDGE |
| | | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Appellant Marilyn Buckley (now Allen) appeals from the August 8, 2022 judgment and decree of divorce entered by the Clark County Circuit Court. She argues that the circuit court erred in finding that the parties had a valid and enforceable marriage and in ordering the division of certain "marital" and "non-marital" property. We affirm.

I. *Facts and Procedural History*

In August 2020, appellee Freddie Buckley was hospitalized in North Little Rock for COVID-19. When he returned to the home the parties shared in Arkadelphia, Marilyn had moved out. Freddie then discovered that the money he had in the bank—and had trusted Marilyn to manage—was gone.

On November 10, Freddie filed a complaint for divorce against Marilyn, alleging that the two were married on September 16, 2013, and resided together as husband and wife until on or about August 4, 2020.

On November 16, Marilyn filed her answer denying the allegations made in the complaint and affirmatively pleading that Freddie had made fraudulent allegations that the two had been married "since there has never existed any state of marriage between the parties." On November 17, Marilyn served Freddie with discovery requesting "any document which in any manner, whatsoever, indicates that any marriage ceremony between Freddie Buckley and Marilyn Allen has been performed or occurred in any State of the United States of America, at any time, since July 11, 2013," which is the date of Marilyn's late husband's passing.

On December 17, Marilyn filed a motion for summary judgment for dismissal of complaint for divorce alleging, among other things, that no response was made to the discovery requests and that Freddie was "forcibly, holding possession of [Marilyn's] homestead." On December 29, Marilyn filed a motion to request an ex parte temporary order placing her in possession of the home located at 215 N. 26th Street in Arkadelphia.

On January 6, 2021, Freddie filed his response to Marilyn's motions for summary judgment and request for an ex parte temporary order. It included arguments that "[l]egal marriage in the State of Arkansas does not require the filing of a marriage license. Rather it may be proved by reputation and other circumstances"; "[t]he parties participated in a solemnization of their union"; "[t]he Plaintiff and Defendant held themselves out as husband

and wife"; and "Plaintiff and Defendant had a reputation in their community as husband and wife." It also alleged, without verification, that Marilyn improperly diverted money from Freddie, and "[i]f the Court determines that the parties are in a lawful marriage, [Marilyn] will not be able to profit from her perfidy without consequence." The pleading had attached multiple exhibits that purport to demonstrate that Freddie and Marilyn held themselves out as husband and wife. Freddie also responded to Marilyn's motion to request an ex parte temporary order, alleging that the property at issue was marital and that he had a right to possession.

On January 7, Marilyn filed a motion to dismiss alleging that the circuit court did not have subject-matter jurisdiction because the parties were not married. Attached to the accompanying trial brief were a copy of Arkansas Code Annotated section 9-11-201, and copies of *Spicer v. Spicer*, 239 Ark. 1013, 397 S.W.2d 129 (1965), and *Crane v. Taliaferro*, 2009 Ark. App. 336, 308 S.W.3d 648. On January 13, Marilyn filed additional attachments, including letters from the clerks of Clark County, Arkansas, and Clark County, Nevada, stating that neither had a record of a marriage license for Marilyn and Freddie.

Also on January 7, Freddie filed a petition to set aside deeds and other legal instruments regarding several documents he claims were forged by Marilyn. On January 11, Freddie filed his response to Marilyn's motion to dismiss, and on January 14, he filed an amended complaint for divorce in which he changed the date of the alleged marriage from September 16, 2013, to September 16, 2014.

Also on January 14, Marilyn filed an answer to the amended complaint denying the claims, referencing the "obvious, lack of certainty by [Freddie] as to whenever, such a claimed marriage might have occurred," and again stating that "there has never been a marriage ceremony conducted between the parties."

On January 26, Marilyn withdrew her motion for summary judgment, stating that Freddie's multiple filings that cite inconsistent dates for their alleged marriage presented a question of fact. On February 5, the circuit court entered an order granting Marilyn's motion to withdraw her motion for summary judgment; granting Freddie's motion to amend his response to Marilyn's motion to dismiss; and denying Marilyn's motion to dismiss and motion to request an ex parte temporary order.

Other motions regarding certain properties were filed, and a temporary order was filed on June 8 regarding the properties at issue, including 215 North 26th Street and 105 S. 20th Street, prohibiting the sale, conveyance, or transfer until the circuit court could hold a hearing and issue a ruling.

A hearing was held on July 15 regarding Freddie's motions for order to cease sale of property; to compel discovery; and for temporary possession of vehicle. The circuit court entered an order on those matters on July 27, granting Freddie's motions to cease the sale of the property and to compel discovery; awarding attorney's fees; and setting out the parties' agreement regarding the vehicle.

A final hearing on the case was scheduled for June 1, 2022. On May 12, Freddie filed a motion to take the deposition of Marty Williams, who lived in Henderson, Nevada.

Pursuant to the transcript, Williams, who is the individual who is alleged to have performed the renewal-of-vows ceremony, did not testify at the trial.

At the final hearing, Freddie testified that he wanted "a church wedding with Marilyn, and she didn't like the plan because it would interfere with income that she had coming in," so they had a renewal of vows instead. When asked why they did not get a marriage license, Freddie testified that "[Marilyn] didn't want to." When asked "So, wouldn't that say that she didn't want to marry you?", Freddie replied, "I - - I guess. . . . I guess so." Freddie testified that the important thing to him was to make Marilyn his wife and that he believed by saying marriage vows in front of a minister and a witness, he was doing just that. He further testified that after September 16, 2014, he considered them to be married and that they both presented themselves to their family and friends as a married couple. Numerous witnesses, including coworkers and fellow church members, testified that Freddie and Marilyn introduced or referred to the other as their "husband" or "wife." Those witnesses also testified that they believed that Freddie and Marilyn were married and that Marilyn was known only as "Marilyn Buckley" or "Freddie's wife."

The parties submitted posttrial briefs. In Marilyn's June 13 brief, she set forth Nevada and Arkansas law regarding solemnization, marriage licenses, common-law marriage, and out-of-state marriages. On the same day, Freddie filed his brief, discussing the same topics and relying heavily on the findings of the Nevada court in *Ponina v. Leland*, 454 P.2d 16 (Nev. 1969). Freddie specifically argued in his brief that "Freddie and Marilyn Buckley's solemnization on September 16, 2014, constitutes a valid marriage."

On August 8, the circuit court entered a judgment and decree of divorce holding that Marilyn and Freddie had a valid and enforceable marriage and dividing certain property and debt. The decree did not list a date that the marriage was alleged to have been entered; however, the disposition sheet listed September 16, 2014—the date of the renewal-of-vows ceremony—as the date of marriage. Marilyn filed a timely notice of appeal on September 1 and an amended notice of appeal on September 6.

## II. *Standard of Review*

The standard of review by an appellate court following a bench trial is whether the circuit court's findings are clearly erroneous. *Bohannon v. Robinson*, 2014 Ark. 458, at 6, 447 S.W.3d 585, 588. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* at 7, 447 S.W.3d at 588–89. Disputed facts and credibility determinations are within the province of the fact-finder. *Id.*

On review of an issue of statutory interpretation, we are not bound by the decision of the circuit court. *Fryar v. Roberts*, 346 Ark. 432, 436, 57 S.W.3d 727, 730 (2001). However, in the absence of a showing that the circuit court erred in its interpretation of the law, that interpretation will be accepted as correct on appeal. *Id.*

## III. *Discussion*

### A. Validity and Enforceability of the "Marriage"

The question before us is whether the parties' September 16, 2014 "Renewal of Vows" ceremony—performed without a marriage license at Graceland Wedding Chapel in

6

Las Vegas, Nevada, between two Arkansas residents who had not previously been married to one another, held a wedding ceremony, or requested, signed, or filed a marriage license together—was sufficient to solemnize their relationship and therefore create a valid and enforceable marriage under Arkansas law.

A history of relevant Arkansas statutes and caselaw on this point is instructive. First, we note that in Arkansas, "[m]arriage is considered in law a civil contract to which the consent of the parties capable in law of contracting is necessary." Ark. Code Ann. § 9-11-101 (Repl. 2020). The Arkansas Supreme Court held in 1911 that "the doctrine of so-called common law marriages has never obtained or become a part of the laws of this State." *Furth v. Furth*, 97 Ark. 272, 277, 133 S.W. 1037, 1038–39 (1911). That remains true, and this case does not attempt to change that policy; rather, it clarifies the current state of Arkansas law regarding marriage licensing requirements and the requirements for solemnization.

In *Fryar*, *supra*, our supreme court cited *Thomas v. Thomas*, 150 Ark. 43, 233 S.W. 808 (1921), and distinguished between licensing and solemnization statutes. *Fryar*, 346 Ark. at 438, 57 S.W.3d at 731. Also in *Fryar*, it was noted that in *Rockefeller v. Rockefeller*, 335 Ark. 145, 980 S.W.2d 255 (1998); *Spicer*, *supra*; and *Furth*, *supra*, one party was attempting to establish proof of the existence of a marriage without proof of compliance with our statutes regulating solemnization of marriages. *Id.* at 441, 57 S.W.3d at 733. In those cases, our supreme court recited language expressing the continuous refusal to recognize common-law marriage within the boundaries of this state. *Id.* And although Arkansas appellate courts have held that our statutes requiring a *marriage license* are directory rather than mandatory, *see De*

*Potty v. De Potty*, 226 Ark. 881, 295 S.W.2d 330 (1956), in *Fryar*, our supreme court specifically noted that "our statutes regulating and prescribing *the manner and form in which marriages may be solemnized* are mandatory and not directory merely." *Id.* at 437, 57 S.W.3d at 730 (quoting *Furth*, 97 Ark. at 273, 133 S.W. at 1037).

It is undisputed that the parties never obtained, much less executed and filed, a marriage license. Accordingly, our analysis turns to the sufficiency of their actions with respect to the requirement of solemnizing the alleged marriage. Our supreme court has held that "there is a presumption of validity in favor of any marriage which is shown to have been solemnized, and that the burden of proving its invalidity rests upon him who questions its validity, and that this is true, notwithstanding it requires proof of a negative." *Lathan v. Lathan*, 175 Ark. 1037, 1040, 1 S.W.2d 67, 68–69 (1928).

The circuit court found that sufficient evidence supported a finding that the parties held themselves out as husband and wife and were recognized in their community as a married couple, but Marilyn argues that this evidence alone is not sufficient to find that a valid and enforceable marriage existed. She submits that the intent to marry, even coupled with living together and holding themselves out as married, is not enough to constitute a valid and enforceable marriage in Arkansas. Freddie responds that he and Marilyn solemnized their marriage by participating in a formal ceremony before a minister and witnesses that included taking marriage vows and exchanging wedding rings, and thereafter conducting themselves as a married couple.

8

In *Crane v. Taliaferro*, *supra*, we addressed circumstances similar to the circuit court's factual findings in the current case, except that the state where the "ceremony" was performed did recognize common-law marriage. *See Crane*, 2009 Ark. App. 336, at 4–5, 308 S.W.3d at 650. In *Crane*, a ceremony was held in Mount Pleasant, Texas, and neither party resided in Texas at the time. *Id.* Unlike Marilyn and Freddie, the parties in *Crane* did hold an actual wedding ceremony. *Id.* But like Marilyn and Freddie, the parties in *Crane* did not obtain, or even attempt to obtain, a marriage license or certificate of marriage in either the state where the ceremony was performed or in Arkansas. *Id.* In the instant case, the circuit court held that the parties held themselves out as husband and wife while living in Arkansas; however, in *Crane*, the court found that the parties had not lived together in the state where the ceremony occurred, and as such, the parties had not established a common-law marriage that would be recognized as valid in Texas. *Id.* The parties could not, therefore, be considered legally married in Arkansas. *Id.*

While the facts are somewhat similar, the circuit court came to a different conclusion in this case. Citing cases as far back as 1872, the circuit court, citing *Jones v. Jones*, 28 Ark. 19 (1872), found that "proof of marriage is either by direct evidence establishing the fact, or by evidence of collateral facts and circumstances from which its existence may be inferred." The *Furth* case, however, held nearly forty years later that "our statutes regulating and prescribing the manner and form in which marriages may be solemnized are mandatory and not directory merely." *Furth*, 97 Ark. at 277, 133 S.W. at 1038. This solemnization requirement has been continuously upheld. *See Spicer*, *supra*.

For more than one hundred years, Arkansas courts have recognized that a valid marriage may be proved by circumstantial evidence. In 1872, in *Jones*, *supra*, our supreme court stated,

> The proof of marriage . . . is either by direct evidence establishing the fact, or by evidence of collateral facts and circumstances from which its existence may be inferred.
>
> . . . .
>
> In civil cases it is common to prove marriage by reputation, declarations and conduct of parties, and other circumstances usually accompanying that relation. It is competent to show conversations and letters addressing each other as man and wife; their appearing in respectable society, and their being received as man and wife; their observance of the customs and usages of society peculiar to the entry upon or subsistence of that relation[.]

*Jones*, 28 Ark. at 22; *see also Martin v. Martin*, 212 Ark. 204, 205 S.W.2d 189 (1947).

In *Thomas*, *supra*, our supreme court found that a legal marriage existed where, although no marriage license was filed, the appellant testified that she and the decedent had been married by a minister, and numerous witnesses testified that the decedent had referred to the appellant as his wife and had conducted himself toward the appellant as his wife and treated her as such. *Thomas*, 150 Ark. at 51–52, 233 S.W. at 811. The *Thomas* court noted that, "according to common repute in the neighborhood [the appellant and the decedent] were regarded as husband and wife." *Id.* at 52, 233 S.W. at 811. Also, in *Butler v. Alldredge*, our supreme court stated that with regard to the argument that marriage can only be proved by exhibition of a marriage certificate,

> [s]uch is not the law. "The law in this state is that marriage may be proved in civil cases by reputation, the declarations and conduct of the parties, and other

circumstances usually accompanying that relation. Declarations of the parties are evidence tending to establish marriage."

. . . .

It is also well established in Arkansas that community reputation is admissible as evidence of marital status.

219 Ark. 197, 199, 242 S.W.2d 136, 137 (1951) (citation omitted) (quoting *Thomas*, 150 Ark. at 53, 233 S.W. at 811).

Regarding the parties' ceremony in Nevada, the certificate signed by a person denoted as "Minister" who performed the ceremony was admitted without objection. At trial, Marilyn's counsel asked no questions of either party about the minister's qualifications or advanced any argument that the minister lacked the requisite qualifications. It is incumbent on the parties to raise arguments initially to the circuit court to give that court an opportunity to consider them, and when a party has not done so, the argument is not preserved, and the appellate court will not address it. *See Baker v. Baker*, 2013 Ark. App. 543, 429 S.W.3d 389.

Further, Arkansas Code Annotated section 9-11-215(a) (Repl. 2020) states that marriages "solemnized by a minister of the gospel or priest . . . shall be according to the forms and customs of the church or society to which he or she belongs." The certificate from Graceland Wedding Chapel demonstrates that the ceremony in which Freddie and Marilyn took part was performed by a minister, and Freddie's testimony and the photos taken at that time demonstrate that their marriage was "according to the forms and customs of the church or society to which he or she belongs." Those customs included purchasing engagement and wedding rings for one other, riding in a limousine to and from the ceremony, Marilyn's

11

carrying a bouquet of flowers, holding the ceremony in a chapel, having family members attend and witness the ceremony, taking traditional wedding vows, and exchanging rings.

Graceland Wedding Chapel records reference a "wedding date" of "9-16-14" and refer to Marilyn Allen as "Bride" and Freddie Buckley as "Groom." And the certificate itself, which was admitted without objection, provides additional evidence that their marriage was solemnized. It states unequivocally that Freddie and Marilyn exchanged "sacred vows of marriage" and is signed both by Marty Williams, who is denoted as "Minister," and by a witness, Marilyn's son, Ruben Casin. The certificate, photos, Graceland Wedding Chapel records, and Freddie's testimony provide incontrovertible proof that Freddie and Marilyn exchanged marriage vows in a formal ceremony before witnesses and a minister.

Further, our courts have repeatedly held that when a man and woman have lived together for any considerable time, holding each other out to the public as husband and wife, a strong presumption arises that they were lawfully married, and the presumption of the legality of the marriage increases with the passage of time. *See Stokes v. Heckler*, 773 F.2d 990 (8th Cir. 1985); *Coogler v. Dorn*, 231 Ark. 188, 328 S.W.2d 506 (1959); *Bruno v. Bruno*, 221 Ark. 759, 256 S.W.2d 341 (1953).

The record before us supports the fact that the parties began living together in September 2013. Thereafter, they referred to themselves as "married" and referred to one other as "husband" and "wife" to family, friends, and congregants. In August 2014, Freddie purchased a $3,000 engagement ring and wedding ring set for Marilyn, and she purchased a wedding band for Freddie. On August 16, 2014, Marilyn posted on her Facebook page a

photo of their respective hands entwined, showing Freddie's wedding band and her engagement ring and wedding band. On October 4, 2015, Freddie posted on his Facebook page a photo of him with Marilyn with the caption, "This is it, my wife, my best friend, love her." On February 13, 2016, Marilyn posted on her Facebook page a photo of her lying on a couch and holding a big bouquet of flowers with the caption, "My husband, Freddie Buckley wishing me a happy Valentine and showing me love."

Freddie testified that Marilyn introduced him to the congregation of her home church, St. Paul A.M.E., as her husband. There was evidence from multiple individuals, including Jennifer Story, Rosboro Hendrix, and Myrtle Smith, that the two held themselves out as spouses and introduced one another as such in both employment and social settings.

Erica Gray, Freddie's daughter, explained that, after Freddie and Marilyn returned from Las Vegas, Marilyn told Erica that "whenever you're in Vegas you can stay with your step-brother," referring to Marilyn's son, Rubin Casin, who resides in Las Vegas, and that Marilyn went on to say, "But I don't believe in step. Y'all are my kids."

The record before us also contains (1) a photo of Marilyn at the church she pastored, next to a sign stating, "Rev. Dr. Marilyn Buckley—Pastor John Wesley AME Zion Church"; (2) Marilyn's business card identifying her as "Rev. Dr. Marilyn Buckley, Pastor"; (3) a program from the John Wesley A.M.E. Zion Church listing the pastor as "Rev. Dr. Marilyn Buckley"; (4) a note from Freddie giving permission for "my wife, Marilyn Allen Buckley" to pick up his W-2 form; (5) Marilyn's LinkedIn profile indicating her last name is Buckley; (6) credit cards listing Marilyn's last name as Buckley; (7) four of Freddie's deceased family

13

members' published obituaries, which identify Marilyn as Freddie's wife; (8) the March 18, 2019 Municipal Health Benefit Fund change form for health insurance adding "Marilyn Allen Buckley, wife" to Freddie's health insurance through his employment; (9) a burial insurance policy on Freddie listing "Marilyn Buckley" as his "wife" and "next of kin"; (10) an application for a life insurance policy for Freddie listing "Marilyn Allen Buckley" as his "spouse" and primary beneficiary; and (11) a life insurance policy insuring Freddie Buckley with the named beneficiary as "Marilyn Allen Buckley, Spouse."

Amber Shepherd, a Court Appointed Special Advocate (CASA), testified that in 2016 and 2017, she was assigned to a dependency-neglect case in which the children who were the subject of the case were placed in Freddie and Marilyn's home; that she made six or seven visits to Freddie and Marilyn's home; that they lived in the home together with the children; that it was her belief that Freddie and Marilyn were married; that in her CASA reports and in all other pleadings in the case, they were referred to as "Freddie and Marilyn Buckley," "the Buckleys," or "Mr. and Mrs. Buckley"; that on each occasion when she visited the home, it appeared that Freddie and Marilyn were a married couple; and that when the case was assigned to her, she was told by the CASA director that Freddie and Marilyn were married. This was followed by express language in the review and permanent custody order, signed by Clark County Circuit Court Judge Robert McCallum, which ordered that "Marilyn and Freddie Buckley are hereby granted permanent custody of [the juveniles]."

The evidence that Freddie and Marilyn held themselves out to the community at large as a married couple is overwhelming and irrefutable. Coupled with the strong presumption

14

of a lawful marriage that arises when a man and a woman have lived together for any considerable time and hold each other out to the public as husband and wife; that the presumption of the legality of the marriage increases with the passage of time; and the fact that one attacking the validity of a marriage has the burden of proving its nonexistence, we hold that under these particular factual circumstances, the circuit court did not commit reversible error by finding that Freddie and Marilyn had solemnized their relationship to the extent that it was a valid and enforceable marriage.

## B. Division of Property

Arkansas Code Annotated section 9-12-315 (Repl. 2020) governs the distribution of marital property at the time of a divorce. Marital property is distributed one-half to each party unless the court finds such division to be inequitable. Ark. Code Ann. § 9-12-315(a)(1)(A). The statute provides that where property is given an unequal distribution, "the court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order entered in the matter." Ark. Code Ann. § 9-12-315(a)(1)(B).

After determining that Marilyn and Freddie had a valid marriage, as addressed above, the circuit court found that Freddie was entitled to divorce on the basis of eighteen months' separation, and it entered provisions for the division of both marital and nonmarital property. Marilyn argues that, where the circuit court improperly divided nonmarital property subject to withholdings from the decree, did not make proper findings to support

15

an unequal distribution of property, and did not make proper findings as to whether certain property was or was not marital, it was erroneous.

The circuit court set over to Freddie a home that it found to be Freddie's separate property and set over to Marilyn a home in Arkansas and a condo in Nevada that it found to be Marilyn's separate property. The circuit court ordered three properties that the parties—or an entity owned and operated by the parties—own together to be sold and the proceeds divided equally. However, it also found that Marilyn owned C.D.s in the total amount of $10,245.24, which she failed to disclose during the pendency of this case, and that the C.D.s were marital property. The circuit court ordered Marilyn to pay Freddie $5,122.62 for his one-half interest in the C.D.s from her share of the real-property sales proceeds.

The circuit court also found that three weeks before Marilyn separated from Freddie, she transferred $7,550 in marital funds from a joint account to accounts to which Freddie had no access. The circuit court ordered Marilyn to pay Freddie $3,775 for his one-half interest in those funds from her share of the real-property sales proceeds.

The circuit court found that from the date of the parties' separation until the trial date, Marilyn received rental income in the amount of $26,178 from properties jointly owned by the parties. The circuit court ordered her to pay Freddie $13,089 for his one-half interest in the marital rental income from her share of the real-property sales proceeds.

At trial, numerous exhibits—including deeds, documentation of the C.D.s, and interrogatory answers demonstrating the amount of rental income received by Marilyn—were admitted into evidence without objection. In his testimony and in his counsel's closing

16

argument, Freddie requested the specific relief awarded by the circuit court and about which Marilyn now complains. However, in his cross-examination of Freddie, his examination of Marilyn, and in his closing argument, Marilyn's counsel failed to raise any objection or make any argument regarding Freddie's requested division. Specifically, Marilyn never argued that Freddie's requested division would constitute an improper division of nonmarital property or an improper unequal division of the marital property.

Marilyn's arguments regarding the division of property and debts, made for the first time on appeal, are barred by her failure to raise those arguments at trial. *See Pilkinton v. Pilkinton*, 2018 Ark. App. 624, 569 S.W.3d 882. Similarly, in *Janjam v. Rajeshwari*, 2020 Ark. App. 448, at 19, 611 S.W.3d 202, 213, we held that a husband's contention that the circuit court did not consider the money in his wife's account at the time of the separation or the reduction of his bonus from contributing to his 401k were barred because the husband made no objection to the circuit court about the distribution of these assets.

Affirmed.

HARRISON, C.J., and THYER, J., agree.

*Dodds, Kidd, Ryan & Rowan*, by: *Catherine A. Ryan*, for appellant.

*The Bennington Law Firm, Inc.*, by: *Madeline L. Bennington*, for appellee.